## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **FUNDACIÓN SEGARRA-BOERMAN e HIJOS, INC., and MILDRED A. SEGARRA-BOERMAN,**<br><br>       **Plaintiffs,**<br><br>**vs.**<br><br>**ALFREDO MARTÍNEZ-ÁLVAREZ; FELIPE SEGARRA INVESTMENT CORP.; TITÍN FOUNDATION, INC.; JOSÉ RAMON QUIÑONES-COLL; MARTÍNEZ-ÁLVAREZ, MENÉNDEZ-CORTADA & LEFRANC ROMERO, PSC; ALFREDO MARTÍNEZ-ÁLVAREZ, JR.; SOFÍA MARTÍNEZ-ÁLVAREZ; and MARTINAL REAL ESTATE CORP.**<br><br>       **Defendants.** | **CIVIL NO. _____( )**<br><br><br>**ACTION FOR VIOLATIONS OF THE ORGANIZED CRIME CONTROL ACT OF 1970; (RACKETEER INFLUENCED AND CORRUPT ORGANIZATION ACT (RICO), 18 U.S.C. §§ 1961-1968); FOR BREACH OF FIDUCIARY DUTIES; FOR DECEIT AND CONSPIRACY**<br><br>**[JURY TRIAL DEMANDED]** |

## COMPLAINT

Plaintiffs, Fundación Segarra-Boerman e Hijos, Inc. ("FSB") and Mildred A. Segarra-Boerman ("Doña Mildred") (collectively, "Plaintiffs") hereby file this complaint against the Defendants Alfredo Martínez-Álvarez ("Freddie" or "Martínez-Álvarez"); Felipe Segarra Investment Corp. ("FSIC"); Titín Foundation, Inc. *f/k/a* L. F. Segarra, Inc. ("Titín Foundation"); José Ramón Quiñones-Coll ("Quiñones-Coll"); the law firm of Martínez-Álvarez, Menéndez Cortada & Lefranc Romero, PSC ("Freddie's Law Firm"); Alfredo Martínez-Álvarez, Jr. ("Alfie"); Sofía Martínez-Álvarez ("Sofía"); and Martinal Real Estate Corp. ("Martinal") (collectively, "Defendants").

1

# TABLE OF CONTENTS

I.  INTRODUCTION ............................................................................................. 4

II.  THE PARTIES ............................................................................................... 6

  A.  The Plaintiffs: a charitable foundation (FSB) and an elderly widowed lady (Doña Mildred). ....................................................................................................... 6

  B.  The Defendants: Freddie, Freddie's confederates, and controlled corporate entities. ........ 9

III.  JURISDICTION AND VENUE ..................................................................... 12

IV.  FACTS COMMON TO ALL CAUSES OF ACTION ................................... 13

  A.  The Segarra-Boerman Family Wealth. ....................................................... 13

  B.  Freddie's opportunistic insinuation into the Segarra-Boerman Family's confidences. ..... 13

  C.  Freddie gains control of the Segarra-Boerman Family's estate planning. ........................ 14

  D.  Freddie gains control of FSB and FSIC despite glaring conflicts of interests hidden from Plaintiffs. ............................................................................................... 19

  E.  Freddie brazenly stacks the FSB Board. ..................................................... 23

  F.  Freddie cozens and coerces Doña Mildred to sell out, then assumes 100% control of FSIC. ........................................................................................................ 24

    1.  Freddie's fraudulent February 25, 2005 letter to Doña Mildred proposing a sale of her interest in FSIC. ............................................................................... 26

    2.  Freddie initiates "friendly" conversations in April 2005 to cozen Doña Mildred to sell her interest in FSIC. ................................................................... 27

    3.  Freddie's fraudulent April 29, 2005 letter cozening Doña Mildred to sell her interest in FSIC. ................................................................................. 30

    4.  A revealing response to Freddie's fraudulent April 29, 2005 letter. ...................... 32

    5.  Freddie finally cozens Doña Mildred to sell her interest in FSIC at the May 10, 2005 Board Meeting. ................................................................... 34

  G.  Freddie engages in gross self-dealing with FSB's real property for personal gain .......... 36

    1.  Freddie, Quiñones-Coll, and Freddie's Law Firm recognize and attempt to undo and reason away the tripartite conflicts of interest that made the Cataño Land Deal illegal ...... 41

  H.  Freddie secures ultimate control of the Family Wealth with Titín's Third Will. ............. 46

  I.  Freddie hustles a diverse portfolio of self-dealings with the misuse of FSB's assets. ..... 47

  J.  Freddie's daughter becomes executive director of the FSB Board. ................................ 47

  K.  Freddie's brother-in-law receives another windfall brokerage fee. ................................ 48

  L.  Defendants steer money from FSB's accounts to charities in which they had an interest…............................................................................................................ 50

  M.  Freddie stole goods and services paid for by FSB to third party vendors. ................... 52

N.   Freddie used confusingly similar letterhead and logos and commingled FSB's funds to benefit himself and a secret foundation. ...................................................................... 52

O.   Freddie dilutes The Segarra-Boerman Family's voice on the FSB Board....................... 54

P.   The Whitewash Report ........................................................................................... 55

Q.   Freddie's failed March 2013 attempt to divide and conquer FSB. ................................ 58

R.   Freddie's unauthorized confirmation of FSB's $10 million brokerage account.............. 62

S.   When Titín dies, Freddie actively conceals Titín's fraudulently-rigged Third Will. ....... 63

T.   The FSB Board confronts Freddie, who hisses: "Me importa un bledo, es mas, me apesta."............................................................................................................................. 64

U.   Freddie leaves FSB's Board slinging accusations and writing more unauthorized checks…......................................................................................................................... 66

V.   Freddie puts the finishing touches on the coup and takes control of $50.3 million. ........ 69

W.     Freddie reigns over the Segarra-Boerman Family's wealth with self-aggrandizing flare…. ....................................................................................................................... 70

V.   CAUSES OF ACTION ............................................................................................ 72

A.   Legal Allegations Common To All RICO Counts......................................................... 72

B.   The Nine Causes of Action Under RICO. .................................................................. 79

FIRST CAUSE OF ACTION ........................................................................................ 79

SECOND CAUSE OF ACTION ..................................................................................... 83

THIRD CAUSE OF ACTION ....................................................................................... 85

FOURTH CAUSE OF ACTION ..................................................................................... 89

FIFTH CAUSE OF ACTION ........................................................................................ 92

SIXTH CAUSE OF ACTION ....................................................................................... 96

SEVENTH CAUSE OF ACTION ................................................................................... 98

EIGHTH CAUSE OF ACTION .................................................................................... 101

NINTH CAUSE OF ACTION...................................................................................... 103

C.   Joint Prayer For Damages Common To RICO Causes Of Action (Counts First Through Ninth). ................................................................................................................... 105

D.   The Two Causes of Action Under Puerto Rico Law. ................................................. 106

TENTH CAUSE OF ACTION ..................................................................................... 106

ELEVENTH CAUSE OF ACTION ............................................................................... 109

E.   Request For Equitable Relief. ............................................................................... 113

PLAINTIFFS' DEMAND FOR JURY TRIAL................................................................... 117

# I.    INTRODUCTION

1.    Trust makes way for treachery.  The treachery at the heart of this lawsuit was perpetrated with the trust bestowed to attorney Alfredo Martínez-Álvarez ("Freddie").

2.    Patiently, persistently, Freddie ran a massive scam on the least-expecting victims. Over four decades, he exploited his role as trusted confidential advisor, corporate officer and director, and "friend" to a venerated non-profit foundation and its wealthy founders, the Segarra-Boerman Family.[1]  Freddie drafted rigged wills, stacked corporate boards, coerced strategic transactions, ignored unwaiveable conflicts of interest, breached fiduciary duties, lied to his clients, engaged in self-dealing, abused vulnerable elders, embezzled third party contracts, masked corporate corruption with genuine charitible contributions, stole business opportunities, caused enormous economic harm, and successfully concealed all of these treacherous machinations until after he and his co-defendants had already looted approximately $100 million dollars, or the vast majority of the Segarra-Boerman Family's wealth.

3.    Freddie was able to execute his long-term heist by ingratiating himself into multiple positions of trust.  He simultaneously served as an officer and director of, as well as the lawyer, "friend," trusted advisor and fiduciary for, the family's charitable foundation (FSB), its landholding company (FSIC), as well as various members of the Segarra-Boerman Family, including Doña Mildred.

4.    With impunity, Freddie covertly plundered the Segarra-Boerman Family's wealth to benefit himself, his family, his extended family, his law firm, and many known and unknown

---

[1] Throughout the Complaint, the term "Segarra-Boerman Family" refers to the nuclear family that was comprised of: (i) Don Felipe Segarra-Serra (deceased); (ii) his wife, Doña Amelia Boerman Marrero (deceased); and their two children (iii) Luis Felipe Segarra Boerman (deceased) and (iv) the named plaintiff, Mildred Segarra Boerman ("Doña Mildred").  Doña Mildred is the only surviving member of the Segarra-Boerman Family and is also the only member of that family to have borne children, through which the family line continues today.

corporate entities that he owned, controlled, or had some affiliation, including charities that directly benefited him, his reputation or his family members.

5.     While serving as FSB's officer and director, and adversely dominating it, and as the advisor and fiduciary of Doña Mildred, Freddie: (i) secretly incorporated a competing foundation; (ii) concurrently served as an officer and director of the competing foundation; (iii) concealed both the existence and his control of the competing foundation from Plaintiffs; (iv) used undue influence, papered coercive transactions and drafted wills structured to bequeath the majority of the Segarra-Boerman Family's wealth to the competing foundation,  and (v) used the charitable donations for his, and his family's, self-aggrandizement, or to boost business to his law firm, all in glaringly direct violation of his fiduciary duties of loyalty owed to Plaintiffs.

6.     According to annual statements filed with the Puerto Rico government, the secret competing foundation possessed total assets and liabilities of $7.7 million at the end of 2013; and at the end of 2014 – after Freddie and his co-defendants consummated their nefarious fraud – the competing foundation declared assets of $50.3 million, ***an approximate $43 million increase in one year***, suddenly becoming one of Puerto Rico's largest non-profit organizations.  In an alarming aftershock, the competing foundation reported at the end of 2015 that its skyrocketing assets of the prior year had inexplicably plummeted by more than $10 million.  Over this same 2013-2015 period, the fortunes of FSB – the original and legitimate charitable foundation created by the Segarra-Boerman Family – had plateaued at $21.7 million in assets and liabilities.

7.     In engineering this massive fraud, Freddie breached fiduciary duties with impunity, breached unwaiveable ethical obligations, commited deceit, and engaged in a conspiracy that violated the Organized Crime Control Act of 1970; (the "Racketeer Influenced and Corrupt Organizations Act" ("RICO"), 18 U.S.C. §§ 1961-1968) as well as many of Puerto

Rico's laws.  Freddie did not act alone, but rather led his co-defendants in a wide ranging and long standing conspiracy to engage in a scheme to defraud by misrepresentations and omissions (by persons who had a duty to speak with full candor) and by cheating Plaintiffs through a pattern of mail fraud (in violation of 18 U.S.C. § 1341), and interstate wire fraud (in violation of 18 U.S.C. § 1343), while violating multiple laws of Puerto Rico, through their use of undue influence, false and fraudulent pretenses, deceit and coercion.

8.     Plaintiffs' costly investigation into this massive fraudulent and cheating scheme, impeded by Defendants' control of the files for many years, nevertheless uncovered decades-long criminal enterprises that systematically marauded not only the Segarra-Boerman Family's foundation, but also *other* philanthropic family foundations.  Defendants' scheme to defraud was so extensive, complex and years-long in the making, that it necessitated a lengthy complaint for the benefit of justice, truth-seeking, and to fully comply with RICO's pleading requirements.

9.     Freddie and his co-Defendants have ravenously plundered vast wealth.  Their criminal, unethical and immoral conduct must be stopped.  Plaintiffs seek damages, treble damages under RICO § 1964(c), injunctive relief including a preliminary and permanent injunction, a constructive trust, disgorgement of illicit gains, and the attorneys' fees and costs incurred in bringing this action.

## II.     THE PARTIES.

### A.     The Plaintiffs: a charitable foundation (FSB) and an elderly widowed lady (Doña Mildred).

10.     FSB is a non-profit foundation engaged in interstate commerce founded in 1971 by Don Felipe Segarra-Serra ("Don Felipe"), and was originally named the "Felipe Segarra Foundation."  The Felipe Segarra Foundation was incorporated by Don Felipe, his wife Doña Amelia Boerman Marrero ("Doña Amelia"), their children (Luis Felipe Segarra and Doña

Mildred), and son-in-law (Don Herman Stubbe) on February 6, 1973.  It was registered as a non-profit corporation on March 2, 1973.

11.  FSB was renamed to "Fundación Segarra Boerman *e Hijos*" (emphasis added) in 1980 in order to incorporate fully the founders' children, Luis Felipe (*a/k/a* "Titín") and Doña Mildred, into the commitment and purposes of FSB, and so that the entire Segarra-Boerman Family could engage in selecting charitable causes.  The Segarra-Boerman Family, for example, as the foremost charitable foundtion in Puerto Rico devoted much of FSB's charitable activities to making education affordable and accessible for low income residents of their beloved Puerto Rico.  To further these charitable causes, the family used a substantial portion of the vast wealth earned over more than a half century by Don Felipe's highly successful real estate developments.

12.  Freddie provided advice and legal services to FSB to further the Segarra-Boerman Family's charitable pursuits and was and remains fully aware of the founders' charitable intent.  The Notary Public Edwin Rosas Noya, then employed at Freddie's Law Firm, officiated and recorded FSB's name change.

13.  Freddie dominated Titín, and Titín was nearly totally dependent upon Freddie.  Born in 1923 and deceased on July 10, 2013 at the age of 89, Titín had never married, never finished college, never had children or heirs, never held any regular employment, was only marginally involved in Don Felipe's business, lived on his parents' generous support and, later, inheritance from them.  After Titín suffered a stroke from which he never recovered, he became wheelchair bound under the constant attention of nurses.  With Titín's health rapidly declining, Freddie and his family immediately increased their influence and domination over him.  As of his death, Titín could hardly read or write.  Titín had become completely dependent on Freddie, in particular concerning his business and legal affairs, the structuring and managing his estate

plans, and his family affairs, especially when they were related in some measure to Titín's wealth.

14.     Titín did not harbor ill-will or animosity toward his parents, nor his only living relatives: his sister, Doña Mildred, his nieces and nephews (Doña Mildred's children), and his great nieces and nephews (Doña Mildred's grandchildren).  Titín indeed was the Godfather (*padrino*) of his nephew, Dr. Herman G. Stubbe Segarra ("Dr. Herman Stubbe"), and of his great niece, Marie Alexandra Hertell Stubbe ("Alexandra") (the daughter of Titín's niece, Marie Amelia Stubbe Hertell ("MASH") and Ambassador Hans H. Hertell).  As Godfather to Dr. Herman Stubbe and Alexandra, Titín happily undertook significant religious and secular obligations for their care and well being.

15.     Titín actively and regularly participated in the social and family affairs of the Segarra-Boerman Family, and attended virtually all important family events, including weddings, baptisms, birthdays, Christmas, and the like, fully enjoying the company of his family, and lunching regularly with his sister, Doña Mildred, and her daughters.  Even in his advanced age, Titín was so comfortable with his nieces that he traveled to the Dominican Republic to visit his niece MASH and her husband, Ambassador Hans H. Hertell ("Ambassador Hertell"), who served as the United States' Ambassador to the Dominican Republic from 2001-2007.

16.     Doña Mildred was born in 1924, lives in San Juan, Puerto Rico, and is presently the Vice President of the Board of Directors of FSB.  Doña Mildred, now widowed, was married to Herman Stubbe Cestero ("Don Herman Stubbe") on December 22, 1945.  They remained married until his death in December 2010.  The family home of Don Herman Stubbe Cestero and Doña Mildred in Condado was transferred in a charitable gesture and at a nominal cost to the

Catholic Church, and was until very recently annexed to the Stella Maris Church, presently undergoing construction.

17.     Doña Mildred and Don Herman Stubbe had four children, one son and three daughters, the only nieces and nephews of Titín, his only family other than his parents and sister. Two of their four children (Dr. Herman Stubbe and MASH), and two of their thirteen grandchildren (Alexandra and Viviana Stubbe-Figueroa) continued the family tradition of service, as either officers or directors, to FSB.  They have represented the Segarra-Boerman Family and the original founder's intents and wishes.  MASH's husband, Ambassador Hertell, was also named to FSB's board.

**B.     The Defendants: Freddie, Freddie's confederates, and controlled corporate entities.**

18.     Alfredo Martínez-Álvarez, or Freddie, is an attorney, a resident of Dorado, Puerto Rico, and the principal tortfeasor, fiduciary-breacher, co-conspirator, schemer, deceptor, elderly-abuser, and mastermind behind the wrongs alleged in this Complaint. The Segarra-Boerman Family, in particular, Doña Mildred, and FSB, relied on Freddie for nearly forty (40) years as the Segarra-Boerman Family lawyer, confidante, business executive, financial and personal advisor, counselor, director and officer of their corporate entities, and family friend.  Freddie served concurrently as: (i) a member, director and officer of FSB from 1993 to 2014; (ii) director and officer of FSIC from 1993 to the present; (iii) incorporator, director and officer of an undisclosed foundation competitor, Titín Foundation, from 1999 to the present; and (iv) owner and/or director and/or officer of numerous interested corporate entities that derived economic benefit from the Segarra-Boerman Family foundations and companies.  Indeed, for many years, Freddie received a monthly retainer from FSB that was paid directly into his personal account.  He also signed the FSB checks that paid his law firm for their services.  Freddie, in secret, actively undercut family relationships, comingled the adverse activities of foundations, and operated

without disclosing his conflicts of interest to Plaintiffs. Freddie's net worth and social profile substantially increased as a result of benefits derived from his multiple roles for the Segarra-Boerman Family, its foundation and companies.

19. FSIC is and has always been a for-profit corporation organized and existing under the laws of Puerto Rico, engaging in interstate commerce. Don Felipe created FSIC in 1971, and served as its president, alongside Doña Amelia, as secretary, and Titín, as treasurer. As described in this Complaint, Freddie unlawfully acquired and wrested control of FSIC from the Segarra-Boerman Family, and now dominates this company.

20. The Titín Foundation (*f/k/a* L. F. Segarra, Inc.) is a non-profit foundation engaging in interstate commerce surreptitiously founded by Freddie in 1999 with Titín and Freddie as directors. It is the corporate entity that Freddie used to stash tens of millions of dollars he stole from the Segarra-Boerman Family's wealth. It is presently held and controlled by Freddie and his family. It presently has no ties to the living descendants of the Segarra-Boerman Family, and it is used freely to advance Freddie and his co-Defendants' interests.

21. Martínez-Álvarez, Menéndez-Cortada, and Lefranc Romero, PSC ("Freddie's Law Firm"), is a law firm organized and existing under the laws of Puerto Rico, operating out of Santurce, Puerto Rico, and engaged in interstate commerce. Freddie's Law Firm provided legal advice and services for fees to Plaintiffs and the Segarra-Boerman Family for decades, in addition to FSIC and the Titín Foundation. Its offices housed Titín Foundation, FSIC, FSB and Martinal and their certain officers and administrators. Freddie's Law Firm's offices also housed other entities, including for-profit corporations and family foundations, illegitimately acquired or controlled by Freddie and the co-Defendants. It sought to use FSB donations in a corrupt way to obtain additional legal business. Freddie was a partner in, and principal member of, Freddie's

Law Firm.  His position is currently described as "Of Counsel".  Numerous other partners, attorneys and employees of Freddie's Law Firm have, over the decades, provided legal services and advice to Plaintiffs, the Segarra-Boerman Family, FSIC and the Titín Foundation.

22.     Martinal Real Estate Corp. ("Martinal"), is a Puerto Rican corporation engaging in interstate commerce with its principal place of business in the same building as the offices of Freddie's Law Firm in Santurce, Puerto Rico.  It is the principal business company of Freddie's family.   It provided administrative business and real estate management services to the companies and foundations of the Segarra-Boerman Family and was, at all relevant times, materially owned and controlled by Freddie and his son Alfie.  Martinal maintained the check register and performed the reconciliations of FSB's bank accounts.  Titín's mail, including sensitive financial documents, was sent to Martinal's office address.

23.     Sofía Martínez-Álvarez ("Sofia") is Freddie's daughter and a resident of San Juan, Puerto Rico.  Sofía, who has a degree in law, was previously, and at times simultaneously, the executive director and salaried employee of both FSB and its competitor Titín Foundation charged with conducting their day-to-day activities.   Sofía never disclosed her role as the executive director of Titin Foundation to Plaintiffs.   She signed the FSB checks ostensibly paying her father's law firm for their services.  Like Freddie, Sofía secretly commingled the activities of both foundations without disclosing her conflict of interest to Plaintiffs.  She is also listed as the "Executive Consultant" of another Puerto Rican family foundation allegedly, duplicitously usurped and abused by Freddie and his confederates.

24.     Alfredo Martínez-Álvarez, Jr. ("Alfie") is Freddie's son and a resident of Dorado, Puerto Rico.  Alfie is the president of Martinal, which provided day-to-day administrative and management services to FSB, FSIC and Titín Foundation and their properties.  He signed the

FSB checks ostensibly paying his father's law firm for its services.  He was involved in *quid pro quo* FSB donations made to increase legal business to his father's law firm.

25.     Jose Ramon Quiñones-Coll ("Quiñones-Coll") is Freddie's cousin and concurrent partner in Freddie's Law Firm, and was actively involved in providing legal services and advice to FSB, the Segarra-Boerman Family, FSIC and the Titín Foundation with respect to the transactions and events germane to Plaintiffs' claims.  Quiñones-Coll was once a director of FSB and a signatory of its bank accounts, and is currently a director and secretary of its undisclosed competitor, Titín Foundation, as well as FSIC.  Miguel Quiñones-Coll, also Freddie's cousin, was the vice president and secretary of Martinal, and a signatory of FSB's bank accounts.  He is also listed as a director of another Puerto Rican family foundation allegedly, duplicitously usurped and abused by Freddie and his confederates.

### III.     JURISDICTION AND VENUE

26.     This Court has subject matter jurisdiction under federal law, specifically, RICO (codified at 18 U.S.C. §§ 1961-1968) and has supplemental jurisdiction under 28 U.S.C. § 1367(a) over causes of action under Puerto Rico law.

27.     Venue is proper under 28 U.S.C. § 1391(b), in that a substantial part of events or omissions alleged herein occurred in this District and a substantial part of the property subject to this action is situated in this District.  Venue is also proper in this District pursuant to 18 U.S.C. §§ 1964 and 1965 (a), in that each of the Defendants resides, is found, has an agent, or transacts its affairs in this District; and under 18 U.S.C. § 1965 (b) that, in the "ends of justice" provides for joint trials for claims against related parties, for the conservation of judicial resoures, and to avoid inconsistent verdicts.

## IV.   FACTS COMMON TO ALL CAUSES OF ACTION

### A.   *The Segarra-Boerman Family Wealth.*

28.      During the 1950s, 1960s and 1970s, Don Felipe owned and developed many of the successful real estate projects in the San Juan area, using FSIC as a landholding company and amassing real estate and cash assets estimated as exceeding $100 million.

29.      In 1979 and 1980, the Segarra-Boerman Family made sizable donations from the wealth they had amassed to their charitable foundation, FSB, to ensure that family assets would be used modestly, without self-aggrandizement, and for certain family-approved charitable purposes, in particular education.  Indeed, Titín himself donated more than 200 acres of valuable land to FSB at that time, before Freddie had achieved complete control and domination over Titín.  Thanks to the Segarra-Boerman Family's legacy of donating its wealth to FSB, hundreds if not thousands of Puerto Rican citizens have been benefitted through grants in the educational, social services, and arts and cultural fields, among others.

### B.   *Freddie's opportunistic insinuation into the Segarra-Boerman Family's confidences.*

30.      Doña Mildred's son, Dr. Herman Stubbe, has known Freddie from childhood.  Dr. Stubbe re-introduced Freddie as an adult professional to his entire family.  In short order Freddie became a trusted family friend, in particular with Titín, and started working as their lawyer and advisor.

31.      Throughout the late 1970s and early 1980s, Freddie worked diligently to obtain a strong personal relationship with Titín and to gain his complete confidence.  Soon after he met Titín, Freddie realized that Titín was going to inherit a great deal of money when his father, Don Felipe, who was then a septuagenarian, died.  He recognized Titín's almost complete financial

13

and emotional dependence on his parents, and commenced a decades-long campaign to turn it into his advantage.

32.     In or around 1983, Don Felipe suffered a serious stroke.  Not long after Don Felipe's 1983 stroke, Freddie, recognizing the opportunity created by the debilitation of Titín's father and the advancing age of Titín's mother, successfully ingratiated his way into Titín's life, gaining Titín's confidence and exercising growing influence, dominance and control over Titín's business and personal family decisions.

33.     Freddie's control over Titín's financial affairs grew until Freddie attained signatory authority on Titín's checking account and the only say on the distribution of funds from Titín's accounts, as well as from FSIC, and from the Titín Foundation.  As Titín aged and his infirmities increased, Freddie had free access to Titín's significant financial accounts without the involvement, much less opposition, by Titín.

### C.     *Freddie gains control of the Segarra-Boerman Family's estate planning*.

34.     Freddie advanced his scheme to defraud the Segarra-Boerman Family by misrepresentations and omissions (by persons under a duty to speak with candor) and by cheating.  The objective of this scheme was to acquire and maintain unfettered control of the Segarra-Boerman wealth by exercising increasing control over Titín and proposing the terms of Titín's will and putative estate that diverted most of his estate away from the Segarra-Boerman Family and their foundation and into entities over which Freddie had control.

35.     Freddie convinced Titín in 1984 that Titín needed a will.  The terms of this first will, among several, revealed Freddie's shell game plan to thwart the reasonable expectations and intent of Freddie's other clients – the charitable foundation FSB, and its founders Don Felipe, Doña Amelia and Doña Mildred – by undermining the family relationships and diverting

14

the assets accumulated by Don Felipe into an entity over which Freddie, and not the Segarra-Boerman Family, would have control.

36.     Titín's First Will was prepared by, or on, Freddie's instructions and/or by Freddie's Law Firm.  The powers conferred upon Freddie as the executor of Titín's First Will were broad and comprehensive.

37.     On December 14, 1984, Titín executed his First Will before Roberto Lefranc Romero as Notary Public.  Lefranc Romero was Freddie's law partner in Freddie's Law Firm at that time.

38.     Freddie utilized his employees and those of the Defendants freely and to suit his convenience, and to perpetrate his fraudulent and cheating scheme.  The witnesses to Titín's First Will were Miguel Quiñones-Coll (Freddie's cousin, and brother to the law partner of both the notary, Lefranc Romero, and Freddie, and also the Vice–President of Martinal, Freddie's company), Samuel Collazo; and Aida Lynn Reyes (both employees or officers of Martinal , and beholden to Freddie).

39.     Paragraph TERCERO of Titín's First Will declared that Titín was unmarried and had no descendants, or "forced heirs," under the laws of Puerto Rico.

40.     Paragraph QUINTO of Titín's First Will named Titín's parents, Don Felipe and Doña Amelia, each as the heirs of only half of his property should he predecease them.  There were no bequests for either his sister, Doña Mildred, or the family foundation, FSB.

41.     After making a series of nominal specific bequests from the other half of his property in paragraph QUINTO (a) through (z) to a number of persons (including the grandchildren of Doña Mildred and Don Herman Stubbe), hospitals, charities, and other entities, Titín's First Will bequeathed the remainder of the second half of his property to a foundation **to**

*be created* as the "*Fundación L.F.S. Incorporado*[,]" *to be established as a non-profit foundation upon his death*, ostensibly to operate in Puerto Rico for religious, charitable, scientific, and literary purposes, and to promote the arts, and to receive *all* of the balance of his estate in the event that his parents predeceased him.  This provision left completely open who would effectively inherit most of Titín's assets by ceding control of that selection to the incorporator of Fundación L.F.S. Incorporado or the executor of Titín's will, Freddie.  It also was contrary to Segarra-Boerman Family's normal bequests to family members and FSB in wills; contrary to the interests of FSB, a client of Freddie's to whom he owed fiduciary duties; and contrary to the intent and interest of the founders of FSB, also clients of Freddie, as well as the interest of Doña Mildred, to whom Freddie also owed fiduciary duties.

42.     Freddie's plan to take firm control of these assets upon the death of Titín was ensured in paragraph SEXTO of Titín's First Will that named Freddie as the executor (*albacea*) of the Will, with others of his law partners as substitute executors.

43.     Had Titín died intestate Doña Mildred would have been his sole beneficiary as a matter of law.

44.     To conceal these nefarious arrangements from Plaintiffs and to abet Freddie's ultimate control of a significant proportion of the family wealth, Freddie and Freddie's Law Firm drafted Titín's First Will so that they could wait until the death of Titín to form the Titín Foundation (and select the controlling board members) thereby creating no public record of it, while ensuring its funding without fear of discovery.

45.     To forestall any opposition after Titín's death, and to ensure Freddie's ultimate control, Freddie and Freddie's Law Firm included in Titín's First Will paragraph NOVENO providing for the nullification of any bequest to anyone who challenged the will.

16

46.    To conceal these nefarious arrangements from Plaintiffs, and to abet Freddie's ultimate control, Freddie and Freddie's Law Firm thwarted Plaintiffs' due diligence efforts and demands.

47.    During the 1980s, Freddie also worked diligently to ingratiate himself with, and gain the confidence of, an elderly Doña Amelia.  On April 8, 1986, Doña Amelia executed her will ("Doña Amelia's Will") before Notary Public Lcdo. Menéndez Cortada, a partner in Freddie's Law Firm at the time that Doña Amelia's Will was executed (presently listed as "Of Counsel" to Freddie's Law Firm).  Doña Amelia's will was prepared by, or on the instructions of, Freddie and/or by Freddie's Law Firm.

48.    In Paragraphs SEGUNDO and TERCERO of Doña Amelia's Will, she named Titín and Doña Mildred as her children and heirs, to share equally in her estate.

49.    In Paragraph QUINTO of Doña Amelia's Will, she named Freddie as her executor, conferring broad and comprehensive powers upon him, including the disposition of property.

50.    On July 29, 1999, Freddie – without breathing a word to his clients Doña Amelia, Doña Mildred, Don Herman Stubbe or the FSB Board of which he was the most active member and to which he owed fiduciary duties – orchestrated the incorporation of L. F. Segarra, Inc. (now renamed as the "Titín Foundation"), as a not-for-profit corporation to use later for diverting tens of millions of dollars of the Segarra-Boerman Family wealth (through the provisions of Doña Amelia's Will and Titín's First Will) into its coffers upon the death of Doña Amelia and Titín and becoming a fully funded, market-dominating competitor to the detriment, and substantial injury, of the business and financial interests of Plaintiffs.

17

51.     The initial members of the Titín Foundation's Board identified in the Certificate of Incorporation were Titín, Freddie, and Lcdo. Menéndez Cortada  (Freddie's law partner and the notary for Doña Amelia's Will) and its offices were located in the same building as Freddie's Law Firm.  No other Segarra-Boerman Family members were ever on the board of the Titín Foundation.  And, when completely funded upon Titín's death, representation by Segarra-Boerman Family members on Titín Foundation's Board would be eliminated.  Defendants actively and successfully concealed these arrangements from Plaintiffs until 2013.

52.     The Titín Foundation began in 1999 with $246,432 in cash.  That number grew in the following years to $2.9 million in 2001; $3.8 million in 2003; $6.1 million in 2006; $7.1 million in 2009; $7.7 million in 2012; and then a whopping $50.3 million in 2014 after Titín's death in 2013.

53.     The Titín Foundation's explosive growth is consistent with a period of years when Freddie ran FSB not so much as a charitable organization but as a piggy bank vehicle for high-growth investment while failing to make proper filings with the taxing authorities and making as few legitimate donations as possible to comply with the legal requirements for its tax-exempt status, ultimately causing FSB to become liable for millions of dollars in income taxes.

54.     Having multiplied its valuation thirty times from its initial $246,432 in cash in 1999 to $7.7 million in 2012, the Titín Foundation, being run by Freddie and his confederates, exhibits the characteristics not so much of a non-profit organization dedicated primarily to charitable activities but a vehicle for high-growth investment.  Now flush with at least $40.3 million of the Segarra-Boerman Family wealth, a significant risk exists that the Titín Foundation will take investment risks that are inappropriate for a charity and dissipate Plaintiff's assets that Defendants' pilfered.

55.     Significantly, four days *after* the incorporation of the Titín Foundation, on August 2, 1999, Titín executed a second will ("Titín's Second Will") before Notary Public Christian Bernaschina Bobadilla, another attorney in Freddie's Law Firm.  The witnesses were Christine Cortes Keiser, Rosa Ileana Flores Otero (both employed by Martinal), and Carl Craig Nevarez.

56.     Titín's Second Will, prepared by or under the direction of Freddie, again named Freddie as his executor, with broad comprehensive powers to administer his estate, and with Menéndez Cortada and Quiñones-Coll as back-up executors.  Again at least two witnesses beholden to Freddie and employed by Martinal, were used.  These provisions were concealed by Defendants from Plaintiffs to impede or prevent discovery.

57.     On November 28, 2000, Doña Amelia died.  Doña Amelia's estate was distributed in 2001 in accordance with her will with Freddie as its executor.  Her estate was estimated to be in excess of $15 million.  As a result of the distribution, by August 1, 2001, Doña Mildred received 50% of the Segarra-Boerman Family's landholding company, FSIC, with Titín receiving the other 50% of FSIC.  Freddie received significant fees for his services as Executor of Doña Amelia's Will.

**D.**     ***Freddie gains control of FSB and FSIC despite glaring conflicts of interests hidden from Plaintiffs***.

58.     Freddie became a director of FSB in 1987, its secretary in 1993, and a member with the right to elect directors to the Board in 1994.  He also became a director of FSIC and its Assistant Treasurer.  Shortly thereafter, the office address for FSB and FSIC was changed to Freddie's Law Firm and he began to exert even more dominance over FSB's affairs.

59.     When he incorporated Titín Foundation in 1999, a charitable business competitor for the assets of the Segarra-Boerman Family, while concurrently serving on the FSB and FSIC Boards, Freddie did not disclose to the either of the two boards that: (i) he was also vice

president and treasurer of Titín Foundation; (ii) Freddie's Law Firm also represented the Titín Foundation; and (iii) Freddie's Law Firm had prepared Titín's wills naming him executor of his estate and provided for the pouring over of the assets into the Titín Foundation which Freddie would control.  Freddie was required by law and by legal ethics to disclose these conflicts of interest to the FSB and FSIC Boards.

60.     On December 31, 2002, Martinal, represented by its president, Alfie, Freddie's son, entered into a Contract of Administration ("Contrato de Administración") for all of the real estate assets of FSB (hereafter, the "Martinal Administration Contract").  At the time that Titín executed the Martinal Administration Contract for the management and control of all of the real estate assets of FSB, Alfie knew, but did not disclose that, Freddie was entrenched in multiple conflicts and potential conflicts since Freddie was also:

a.      the owner of Martinal;

b.      a member of the FSB Board;

c.      the attorney for FSB;

d.      a director and the secretary of FSIC;

e.      the attorney for FSIC;

f.      an attorney, confidante and fiduciary of Doña Mildred;

g.      the person identified as the emergency contact for Doña Mildred's bank and investment accounts;

h.      the person with virtually complete control over the financial affairs and decisions of Titín, including being the sole signatory on Titín's, and a signatory on FSIC's, and the Titín Foundation's, bank accounts;

i.      the person that Titín had to ask for money when he wanted it; and

j.      the person identified as the Trustee in the educational trusts for the grandchildren of Don Herman and Doña Mildred.

61.     The Martinal Administration Contract was executed for FSB by Titín.  It was a *fait accompli* when, according to the FSB minutes prepared by Freddie, the Martinal Administration Contract was presented and voted upon by the FSB Board.  Although according to these minutes Freddie abstained from voting, he purposefully never disclosed, or asked for, much less obtained, a waiver of his conflicts. Nor did Alfie. Neither Freddie, nor Freddie's Law Firm, ever advised Plaintiffs that they should retain independent counsel to advise them on the arrangements.

62.     The Martinal Administration Contract, in the First through Eighth clauses, gave Martinal, Freddie's family business, and, therefore, Freddie and Alfie – complete control over the administration and management of all of the property of FSB, real and personal, including its investments, rental properties, mortgages, and loans, present and future.  This arrangement provided Freddie with enormous opportunity to abuse his position as well as a greater profile in the Puerto Rico business community.

63.      FSIC also entered into an administration contract with Martinal for all of its assets.  FSIC's records are under the control of Freddie, Alfie and their confederates.

64.     The Ninth clause of the Martinal Administration Contract purported to exonerate and hold harmless Martinal – and, therefore, Alfie and Freddie – from all "errors in judgment, or errors of fact or law, or for any other thing" that it might do in connection with the administration of FSB, except "intentional and malicious conduct or gross negligence" of Martinal.  Despite this overreaching limitation on its potential liability, Martinal, at the direction of Freddie and his son Alfie, did, in fact, commit "intentional and malicious conduct or gross negligence" within the Ninth clause of the contract in its administration under the Martinal Administration Contract.

21

65.     The Tenth clause provided for compensation to Martinal in the amount of "SEVEN PERCENT (7%) of the aggregate total of all rents, utilities, and mortgage interest deposited by Martinal monthly," plus $500 monthly to review the portfolio.  FSB's accountant, a close friend of Freddie, was already charging FSB $800 a month for reviewing the portfolio.  At that time, the "aggregate total of all rents, utilities, and mortgage interest deposited by Martinal" was nearly $1,000,000.00 annually, thus producing approximately $70,000.00 in annual income to Martinal with day-to-day control over FSB's property.

66.     Freddie, Freddie's Law Firm, Martinal and their confederates have used the same or similar, devices to gain control over the assets of other families and their foundations by disenfranchising all family members, as reflected in the allegations in the extensive litigation over the Fundación Eduardo Méndez Bagur, Inc. and the Fundación Esposos Luis Méndez Vaz y María Bagur, Inc. (collectively, the "Méndez-Bagur Foundations").[2]  Freddie, Freddie's Law Firm and his law partners drafted the Méndez-Bagur Foundations' incorporation and estate planning documents, which they designed to oust the surviving family members from the foundations' operations.  In spite of attempts by the surviving family members to partake in the foundations' operations (and years-long litigation to vindicate these rights), the Méndez-Bagur Foundations and their assets now lie within the exclusive control of Freddie, Freddie's Law Firm, Martinal and their confederates.

67.     Over the years, Freddie, his law partners and confederates, including but not limited to his cousin and executive of Martinal, Miguel Quiñones-Coll, and Antonio Ochoa

---

[2] The Court records in Puerto Rico reflect that the family of Eduardo Méndez-Bagur became enveloped in protracted litigation with Freddie, his law partners, and Martinal, regarding the incorporation and estate planning documents of the Méndez-Bagur Foundations, which were designed to exclude the family members from the foundations' operations.  The litigation hinged on the ambiguity of a certain term in the incorporation and estate planning documents regarding who may qualify as a foundation trustee, which after an appeal ruled in the family members' favor, was resolved in Freddie's favor by the Supreme Court of Puerto Rico; nevertheless, the same pattern utilized by Freddie and his confederates, as alleged here, is present.

(whom Freddie also brought in as a director of FSB and FSIC) have acted continuously or intermittently as directors of the Méndez-Bagur Foundations.  Since December 2009, Sofía also has been acting as an "Executive Consultant" to the Méndez-Bagur Foundations.  This regular way of doing business by Defendants, by its very nature, substantial duration, its similarity of modus operandi, and its persistence over long-ranging time projects into the future a threat of repetition against these Plaintiffs, or other similarly situated unless it is stopped by this Court. Only discovery supervised or ordered by this Court will reveal the extent of Freddie and his confederates' schemes to defraud similarly situated family foundations.

### E. *Freddie brazenly stacks the FSB Board*.

68.     During 2004, MASH – Don Felipe's granddaughter and Doña Mildred's daughter – expressed her desire to become a member of the FSB Board.

69.     To neutralize MASH's appointment, Freddie insisted, without disclosing his true reasons, upon the coincidental appointment of Quiñones-Coll – his cousin and law partner – as a member of the FSB Board.  Freddie's additional appointment, driven in part by his animosity toward MASH and concern over her ability to question his conduct, allowed him to nullify the votes of Segarra-Boerman Family members – other than Titín who was under his control – so they would not outnumber the votes of FSB Board members under Freddie's control.

70.     At the December 21, 2004 FSB Board Meeting, MASH and Quiñones-Coll were made members of the FSB Board.  This was the first time a non-elderly family member, and a working professional, of the Segarra-Boerman Family, became involved with FSB's governance and operations.

71.     At the December 21, 2004 meeting, Freddie proposed that an annual unrestricted donation of $20,000 be made to the Puerto Rico Community Foundation.  With an unrestricted donation, the Puerto Rico Community Foundation could use this annual donation for any

23

purpose, including rent.  Freddie made no disclosures to FSB about how the donation was to be spent but he abstained on the vote, mentioning a relationship with its landlord.  The Puerto Rico Community Foundation proposal was granted and the subsequent donations were made.  Freddie never disclosed the uses of the annual donations especially whether the donations were in fact used to pay rent to Freddie or to his, or his family's, interests.

72.     At the end of 2004, the Board of FSB was comprised of Doña Mildred (aged 81), Don Herman Stubbe (aged 87), Titín (aged 80), MASH (aged 52), and Freddie and Quiñones-Coll.

73.     At the end of 2004, the Board of Directors of FSIC was similarly comprised of mostly elderly directors and members of the Segarra-Boerman Family:  Titín, Doña Mildred, and Don Herman Stubbe, and Freddie.

74.     At the end of 2004, the Board of Titín Foundation was comprised of Titín, Freddie, and Quiñones-Coll, Freddie's cousin and law partner.

75.     At the end of 2004, Freddie and Freddie's Law Firm represented Doña Mildred, Titín, FSB, FSIC and the Titín Foundation.

**F.     *Freddie cozens and coerces Doña Mildred to sell out, then assumes 100% control of FSIC.***

76.     In 2005, FSIC's investment portfolio and income generated by the real estate properties (worth tens of millions of dollars) totaled more than $1.5 million dollars annually. From 1998 through 2004, equally divided dividends had been paid out on an annual basis to Titín and Doña Mildred, as the sole shareholders of FSIC.  The total amount paid over those six years was approximately $363,640.00.  Consistent with this long standing business practice, in 2005, Doña Mildred, expected and sought a modest increased distribution of $40,000 each to herself and Titín to cover her living expenses.

77.     On or about February 1, 2005, Freddie summoned a meeting at the offices of Freddie's Law Firm attended by Anita Brennan, Freddie, Doña Mildred, and Don Herman Stubbe.  Anita Brennan was an investment banker at UBS, who at the time and for many years, managed some family accounts for Doña Mildred and Don Hermann.

78.     Titín did not attend this February 2005 meeting.

79.     At nearly all of the family business and foundation meetings attended by both Titín and Freddie – whether of the FSIC Board, the FSB Board, or anything else – Freddie always "spoke for" Titín.  Especially as he aged and after his stroke, Titín himself virtually never spoke at any board meeting of any of the entities owned and/or controlled by the Segarra-Boerman Family, including FSB and FSIC.

80.     During the February 2005 meeting, Freddie falsely represented that Titín, who inherited FSIC in equal parts with Doña Mildred, had decided to reject her request for a modest increased dividend payment from the company to cover her and her husband's expenses.  Superficial reasons for this dramatic change in past practices were given.

81.     Freddie was not merely carrying out his duties as a mouth piece for Titín during this meeting.  Rather, he was fraudulently engaging in superficially lawful actions to cozen and coerce Doña Mildred through her unquestioning trust in him into consenting to a key element of his scheme to acquire and maintain control over the Segarra-Boerman Family wealth by acquiring and maintaining those entities in which it would be invested.  Therefore, he initiated and pursued a discussion of conflicting interests designed to lead to the conclusion that the shareholders should part ways.

82.     Freddie rejected Doña Mildred's request for dividend in order to induce her advisors into recommending to her, that she give up her interest in FSIC and its valuable real

estate.  Freddie calculated that through acting under the color of legitimate right gained through his undue influence over Titín, if Freddie had even discussed it with him at all, this "solution" would develop.   With Freddie's intimate knowledge of Doña Mildred's nature and her circumstances, and Anita Brennan's interests, he knew that this sudden and unprecedented refusal to agree to her modest distribution request would set the stage for Doña Mildred to be cozened and coerced into accepting the sale of her interest in the company as a solution to the lack of any further distributions from FSIC for the well-being of herself and her wheelchair bound husband.  This plan, concocted by Freddie, was in gross violation of Freddie's fiduciary duties owed to Doña Mildred.

83.    Doña Mildred trusted Freddie, so she reasonably believed that Freddie had the power over, or authority from, Titín and FSIC to withhold the dividends, but also that this proposed solution would be in her best interests and those of her husband.

1.    ***Freddie's fraudulent February 25, 2005 letter to Doña Mildred proposing a sale of her interest in FSIC.***

84.    Seizing an opportunity, and simultaneously misleading by papering the proposed transaction, Freddie maneuvered Doña Mildred into giving up her interest in FSIC.  A letter dated February 25, 2005 was mailed by U.S. posting to Doña Mildred and Don Herman Stubbe, falsely purporting to have been composed by Titín as FSIC's president and falsely alleging to be sent "pursuant to" Doña Mildred's and Don Herman Stubbe's "request."  Titín was over 81 years old and his ability to read or write was diminished to the extent that he had become almost completely dependent upon Freddie for his business management.  The real party in interest in this offer, who caused its preparation and mailing by U.S. posting, was Freddie, who was seeking control over the Segarra-Boerman Family fortune through acquiring and maintaining control over the real estate held by FSIC, eliminating Doña Mildred from her board-level management

position and ownership, and then setting the stage for placing FSIC and its valuable real estate into the Titín Foundation, controlled by Freddie and his family.  This letter was prepared by Freddie and/or Quiñones-Coll, or at Freddie's direction.

85.     The letter dated February 25, 2005 again offered to Doña Mildred a chance to obtain continued needed cash flow in exchange for her relinquishing her interests in the Segarra-Boerman Family's most prized possessions, the vast real estate holdings of FSIC.

86.     Despite the obvious conflicts in representing any one, much less all parties – FSIC, Titín and Doña Mildred – in the transaction, Freddie and/or Freddie's Law Firm through Quiñones-Coll and others, acting upon Freddie's instructions, undertook to draft the February 25, 2005 offer letter that was intended to, and did, take advantage of, an 81-year-old woman, Doña Mildred.

87.     The February 25, 2005 offer letter proposed three appraisers for FSIC real property with whom Freddie was very familiar or had business dealings.

2.     *Freddie initiates "friendly" conversations in April 2005 to cozen Doña Mildred to sell her interest in FSIC.*

88.     In April 2005, Freddie furthered his treacherous scheme by pursuing conversations with Doña Mildred and her nominal "advisors," Anita Brennan and her husband, Lcdo. Manuel Sarmiento, by telephone and in-person, regarding the offer proposed in the February 25, 2005 letter.  Anita Brennan had a personal financial interest in the consummation of a buyout through the payment of a large amount of cash and securities, estimated to be in excess of $10 million, to Doña Mildred that she knew would be placed into family accounts with her at UBS.  Her husband, too, had the same personal financial interest in such an outcome when he undertook to advise Doña Mildred in this matter.  Neither advised Doña Mildred of their conflicts of interest.

27

89.     Freddie abused the trust that Doña Mildred had placed in him for decades in order to cozen her into accepting the offer from FSIC by playing on her lack of knowledge, age, and concern for her wheel chair bound husband, aged 87, and characterizing the sale as a "convenient" solution to the interruption of income from FSIC.  A suggestion with which Anita Brennan agreed.

90.     Freddie shamelessly engaged in egregious, manipulative elder abuse over several months through deceitful, manipulative calls and letters posted in US mails in furtherance of his and his confederates' scheme to acquire and maintain control over the Segarra-Boerman Family wealth to which they had no right by acquiring and maintaining control over in FSIC.

91.     At the time of the April 2005 conversations, Freddie could not have legally participated in resolving any legitimate dispute within the family, much less one he fraudulently concocted for his own benefit.  Freddie was an officer and director of FSIC, and Freddie and Freddie's Law Firm represented FSIC and Titín in connection with the February 25, 2005 offer. Freddie was also an advisor and fiduciary of Doña Mildred, who relied, in fact, on his advice, his position of trust with the Segarra-Boerman Family, and on his business and legal expertise, to arrive at a decision on the offer.

92.     Freddie failed to disclose to Doña Mildred that Freddie and Freddie's Law Firm were actually acting as counsel to FSIC and Titín in connection with the FSIC Buyout Offer and that she could not rely on him as a longtime advisor and her lawyer, or even as her friend, as she had done for the past several decades.

93.     In fact, Freddie lied to Doña Mildred about being only Titín's "friend" and her "friend" when he was really acting as the lawyer for Titín, FSIC, and indirectly the Titín

Foundation at the time.  Freddie, Freddie's Law Firm, through Quiñones-Coll and others prepared the fraudulent February 25, 2005 letter and "Letter of Intent."

94.     Freddie and Freddie's Law Firm's authorship of the February 25, 2005 letter, its mailing in U.S. posting, and other legal documents concerning the buy-out is evidenced in several ways including in an invoice addressed to Doña Mildred for services provided by an accountant that describes the accountant's "review of documents **prepared by attorney Alfredo Martinez Alvares [sic] in relation with the buy / sell agreement of all the shares of Felipe Segarra Investment Corp. owned by Mrs. Mildred Segarra Boerman**".

95.     Freddie and Freddie's Law Firm's authorship is also evidenced in a May 2005 letter from Anita Brennan to Freddie, mailed by U. S. posting, in which she notes that Freddie and Freddie's Law Firm "prepared and composed" the "Letter of Intent."

96.     At the time of the April 2005 conversations and meetings, Freddie failed to disclose his other conflicts of interest to Doña Mildred, her accountant and self-interested legal and financial advisors, notably that:  (i) he had incorporated, and both he and Quiñones-Coll were officers and directors of, Titín Foundation; (ii) Titín was an officer and director of Titín Foundation; (iii) Doña Mildred's interest in FSIC would end up in Titín Foundation by operation of Titín's will, which he or his law firm had drafted; and (iv) Freddie and Freddie's Law firm represented the interests of the Titín Foundation in this proposed transaction.

97.     At this time, Freddie was also an officer, director, administrator and lawyer for a competitor of Titín Foundation, FSB, and so was Quiñones-Coll. They owed conflicting fiduciary duties to FSB and Titín Foundation.  Freddie's Law Firm, in which they were partners, also served as the lawyers for clients with competing interests, FSB and Titín Foundation.

98.     At this time, Freddie was also an officer, director, administrator, and lawyer of FSIC and owed fiduciary duties to FSIC and to its shareholders, including Doña Mildred.  Thus, he and Freddie's Law firm were simultaneously representing at least three corporate clients with competing and conflicting interests.

### 3.     *Freddie's fraudulent April 29, 2005 letter cozening Doña Mildred to sell her interest in FSIC.*

99.     Masquerading again as Doña Mildred's so-called "friend" and confidante, Freddie mailed a letter by U.S. posting to Anita Brennan dated April 29, 2005, prepared by Freddie and his law firm, through Quiñones-Coll or others, to make a false record by summarizing his version of what transpired at that morning's meeting among Doña Mildred, Don Herman Stubbe, Anita Brennan, and Freddie.

100.     In Freddie's April 29, 2005 letter, he confirmed that a morning meeting had been held at his offices and that he and Anita Brennan had discussed the so-called advantages to Doña Mildred, including being out from under the threat of economic insecurity that he hypocritically and falsely presents as only her advisors' recommendation as to the benefits of selling her interest in FSIC.

101.     In Freddie's April 29, 2005 letter, he continued to stoke the false fire he had created and again advocated for Doña Mildred to sell her FSIC shares to FSIC, by characterizing the transaction as convenient to her: "... advantages like that Mildred can dispose of her income as her necessities dictate without having to require a declaration of a dividend, to which, the other associate [Titín], not having the same interests and needs could object."  Freddie was actually seeking to acquire and maintain unfettered control over the property of FSIC owned by Doña Mildred to which he had no right by defrauding and coercing her to act to quell this artificial "problem," all to her long term financial detriment.

102.    Freddie's April 29, 2005 letter, was also intended to, and did, force a rushed uninformed decision by reiterating a thought supposedly raised by Anita Brennan that it would be "convenient to complete the transaction in the shortest time possible" for supposed tax reasons.

103.    In Freddie's April 29, 2005 letter, Freddie fraudulently stated that Freddie was only acting "as a friend" in seeking to convince her to accept it in her best interests: "It needs to be clear that my function in this transaction is as a friend of the parties and not as a lawyer, limited to supplying to the appraisers and the accountants all of the information that they have requested in order to perform the analysis that is required for the appraisals and the accountant's reports."  This characterization of his role was a flat out lie, and the letter fraudulently omitted much material information Freddie was obligated to disclose.

104.    Freddie's April 29, 2005 letter fraudulently stated that it was only the "intention and wish" of Doña Mildred and Don Herman Stubbe for the transaction to be kept strictly confidential.  In fact, Doña Mildred and Don Herman Stubbe were told and made to believe that they must keep the transaction confidential or it would be withdrawn.  Indeed, confidentiality from any third person was an express condition of the February 25, 2005 Letter of Intent from FSIC.  Freddie desired this provision to prevent their adult children from being apprised of a critically important financial decision made by their parents, aged in their 80s.  Confidentiality would ensure the success of the deal without Doña Mildred and Don Hermann Stubbe's children, whom they normally relied on to help make such decisions, potentially questioning the soundness of this complex economic and legal transaction into which she was being forced.

105.    Fraudulently feigning neutrality and relying on a decades old confidential relationship of superior knowledge and trust in the face of his numerous, *undisclosed* (and

31

unwaiveable) conflicts of interest caused by his various conflicting professional relationships with FSIC, the Titín Foundation, Titín, Doña Mildred, and FSB, and fraudulently failing to express his real self-dealing motive – to talk an 81-year-old woman, Doña Mildred, into giving up her valuable half interest in FSIC through manipulation of her trust and emotions – Freddie engaged in egregious, unconscionable, reprehensible, shameful, immoral and illegal conduct constituting fraud, cheating and breaches of fiduciary duties.

### 4.   *A revealing response to Freddie's fraudulent April 29, 2005 letter.*

106.    In a May 2005 letter mailed by U.S. posting to Freddie, Anita Brennan indicated that Freddie had represented that the value of the FSIC investment portfolio being managed by UBS and Oriental Bank was approximately $14 million.

107.    In her May 2005 letter, also sent by U.S. posting, Anita Brennan also referenced to statements by Freddie during the February 2005 and April 2005 conversations in which he "made clear" that Titín's relationships with his nieces (MASH, Mildred Teresa Stubbe, and Gretchen Stubbe) and nephew (Dr. Herman Stubbe) "were not the best."  These representations were a flat out lie and designed to further his agenda to separate the shareholders of FSIC.

108.    At no time during any meeting of the FSB Board or the FSIC Board, or privately to his sister or her children or grandchildren, did Titín ever express that his relationships with his nieces and nephews "were not the best."

109.    Freddie's false representations about familial discord were designed to influence not only Doña Mildred, but also Anita Brennan and her husband Manuel Sarmiento, to engage them into bolstering the confusion and belief of Doña Mildred that Freddie had a legitimate basis to, and would, fulfill his implicit threat that no more living expense distributions would be authorized from FSIC, the iron fist in his velvet glove, and to persuade her to accept and fulfill the February 25th offer.  Doña Mildred, who at the age of 81 avoided embarrassing personal

confrontation and conflict at all costs, did not seek verification from her brother, Titín, of these familial discord representations, but rather relied on her long-trusted advisor, lawyer and friend, Freddie to be speaking the truth.

110.    Freddie's representation that Titín's relationships with his nieces and nephew were "not the best" was a flat out lie, or something he created and secretly fostered,  and was intended to confuse and drive a wedge between Titín and them.

111.    Freddie's false representation that Titín's relationships with his nieces and nephew was "not the best" was intended to confuse, alarm and subtly intimidate Doña Mildred into accepting the February 25th offer.

112.    Freddie, knowing all too well his aging client's mind and her personal code of reticence and courtesy, expected Doña Mildred would refuse to verify and pulled off his bluff.

113.     In accordance with Freddie's manipulative and isolating instructions to her, a trusting client and confidante, and an express requirement of the offer, Doña Mildred kept all discussions regarding the transaction, from the February 25th offer to the time of the ultimate closing, completely confidential.  Other than her elderly husband, Don Herman Stubbe, nobody in her family was informed or knew of what had transpired until after it was a *fait accompli.*

114.    Significantly, Anita Brennan's May 2005 letter confirmed that **Freddie** had admitted that he had prepared a "Letter of Intent" comprising the February 25th offer.  Despite his verbal and written denial and assurances that he would provide only friendly advice, he did, in fact, act as a lawyer.  At every step, he repeated or insinuated, the "reality" of economic insecurity if Doña Mildred did not consent to the "convenience" of being bought out of FSIC.

115.    Prior to bringing this action, Doña Mildred believed that Freddie was not only her confidante and friend, but her attorney, not only in connection with personal matters and matters

relating to the offer and FSB, but in other matters as well.  She unfortunately believed that he only wanted the best for her.

116.    Anita Brennan's May 2005 Letter demonstrates that Freddie tried to shirk his professional and fiduciary obligations by suggesting that Manuel Sarmiento, Anita Brennan's husband and an attorney, represent Doña Mildred and Don Herman Stubbe in connection with the proposed transaction and prepare the closing documentation.  The ethical rules and laws of Puerto Rico are not so facile as to permit an attorney to avoid his obligations and liabilities by transferring them to another in such a fashion.

117.    Even though Mr. Sarmiento nominally advised Doña Mildred on the form of the documentation in connection with the sale of her interest in FSIC, it was Freddie's Law Firm through Quiñones-Coll and others, that prepared the February 25, 2005 letter containing the terms and conditions of the buyout, and upon Freddie's advice that all was proper and convenient that Doña Mildred relied.  She continued to rely upon Freddie's "friendly" advice to the detriment of herself and FSB.  These repeated subtle economic and family problems, "friendly" advice, and misplaced trust culminated in Doña Mildred's consent to give up her interest in FSIC to the detriment of her and FSB's long term interests.

118.    The deal documents simply followed the offer letter terms, thus assuring the transfer of a large portfolio of securities into UBS accounts managed by the wife of Doña Mildred's supposed independent lawyer.

     **5.**     ***Freddie finally cozens Doña Mildred to sell her interest in FSIC at the May 10, 2005 Board Meeting.***

119.    On May 10, 2005, the accounting firm employed by FSIC faxed by interstate wire a supposed "independent" accountant's report on the valuation of FSIC to Doña Mildred.  This

valuation was prepared upon instructions from Freddie and/or Freddie's Law Firm.   This accounting firm was also employed by FSB under Freddie's instructions in other matters.

120.   That same day, the FSIC Board held a meeting at which all of the directors – Doña Mildred, Don Herman Stubbe, Titín, and Freddie – were present and at which FSIC passed a resolution authorizing Titín, as its president, to sign the buy-out documents for Doña Mildred's interest in FSIC.   Slipped in the resolution was a term never included in the February 25, 2005 Letter of Intent or the buy-out closing documents reviewed by any of Doña Mildred's conflicted "advisors" or by herself.   The resolution included the setting of a redemption date for Doña Mildred's FSIC preferred shares all of which were not subject to the buy-out transaction.   The redemption price for the preferred was mere par value.   Thus, Doña Mildred, bereft of disinterested advice, was pushed into the sale, including new terms slipped into a resolution, within hours or only minutes of receiving a valuation from the Buyer's accountant.

121.   As planned by Freddie and his confederates, Doña Mildred received none of the long-term most valuable real property assets of FSIC in exchange for selling her interest in FSIC. The cash and securities she received were wired by interstate wires to accounts at UBS managed by Anita Brennan.

122.   Instructions for the transfer of FSIC funds were faxed by interstate wires by Freddie, or on his instructions, to the various financial institutions to consummate the sale.

123.   Full payment on the transaction was not made until March 2006 when Freddie corresponded with Manuel Sarmiento and mailed by U.S. posting a check to him.   Doña Mildred's preferred shares were redeemed by check in 2009. The check was cashed and the money transferred by interstate communications.

124.   After the consummation of the transaction with FSIC, which cancelled Doña Mildred's interest, Titín held 100% of FSIC, and upon his death, FSIC became a subsidiary of Titín Foundation by operation of his third will.

125.   Subsequent to the buyout by FSIC, Freddie and/or Quiñones-Coll prepared documents for Titín to sign to remove Doña Mildred from the FSIC Board.  Freddie became the vice president of FSIC, and his law partner Quiñones-Coll became its treasurer.

126.   After the removal of Doña Mildred, Freddie had acquired and now maintained control over not only the Board of FSIC and Titín, individually, but also over the most valuable assets of the Segarra-Boerman Family wealth, its real estate held by FSIC.

### G.   Freddie engages in gross self-dealing with FSB's real property for personal gain

127.   In one of the most egregious instances of self-dealing with FSB's property, conscious disregard of multiple conflicts of interests, and breaches of fiduciary duties owed as a director and attorney of FSB, Freddie caused 156 *cuerdas*[3] of land owned by FSB, located in the Cataño district of Bayamón, Puerto Rico, to be transferred to a for-profit development company, Infinity Corp. ("Infinity"), which he indirectly owned and controlled (hereinafter the "Cataño Land").  Freddie's entrepreneurial gambit to wrest away, develop and enrich himself with FSB's land was named "Grand Park Village," a proposed high-density residential village consisting of 1,350 units, offering a scenic view of the San Juan Bay and the historical site of *El Morro*.  This land transfer was far from an arms-length transaction, and caused FSB great injury by leading a charitable foundation down the path of a risky, speculative, and ultimately botched business venture, costing hundreds of thousands of dollars in development costs and the loss of 50% of the Cataño Land.  The Master Plan studies and location maps for this extensive development

---

[3] One *cuerda* is equivalent to 0.97 acres of land.

36

demonstrate the extent of Freddie's great expectations and motivation to take advantage of the property gifted decades before by Titín to FSB.



Master Plan Studies — Scheme A                Master Plan Studies — Scheme B

Grand Park Village
Infinity Inc. — Dorado Beach, Puerto Rico
HART HOWERTON — Planning, Architecture and Landscape Architecture, P.C. — New York, San Francisco
March 2002



128.    To build the Grand Park Village, Freddie sought to develop 34.95 *cuerdas* of the Cataño Land by creating two islands on top of marshlands, on which he would build the high-

density residential village.   According to an April 4, 2006 report requested by Freddie and Martinal, Pedro A. Pons of the firm Pons, Fossas & Lamadrid (the same appraiser for the buy-out of Doña Mildred) these 34.95 *cuerdas* of real property were valued at a staggering $20 million dollars, assuming the permits to develop this ecologically sensitive land had been approved by the governmental authorities.   Freddie was never able to obtain the requisite permits despite expending substantial resources in this endeavor.

129.     Freddie's maneuvers with the Cataño Land, which culminated in its illegal transfer to Infinity, have a long history.   Illustrative of the "way things were" before Freddie became involved with FSB and the Segarra-Boerman Family affairs, in 1979, ***Titín donated to FSB*** a very large and valuable tract of land (260.8 *cuerdas*) estimated to be worth, at the time, $530,037.00.   This donation to FSB occurred before Titín became reliant on Freddie, and before Freddie began to take advantage and ultimately complete control of Titín.

130.     The public records indicate that in the early 1990s Freddie caused this large tract of land to be subdivided into a number of parcels that were sold to third parties.   Some of the parcels were sold to third parties at very low, almost depressed prices, and flipped by those third parties at ten times the original purchase price.   After being subdivided into at least nine parcels, what remained of the original tract of land was the 156 *cuerdas* of the Cataño Land.

131.     Seeing an opportunity to take further economic advantage of FSB's property, Freddie concocted a plan to transfer the Cataño Land in a self-dealing transaction masked as an investment opportunity for FSB.   In furtherance of this plan, on May 13, 1997, Freddie caused the FSB Board, in a meeting attended only by 93-year old Doña Amelia, Titín and Freddie (the "May 1997 FSB Board Meeting"), to authorize a deal whereby the Cataño Land would be

transferred to Infinity in exchange for FSB receiving 50% shares of this company (the "Cataño Land Deal").

132.     The May 1997 FSB Board Meeting was held without the presence of Doña Mildred or Don Hermann Stubbe, neither of whom received notice of this meeting or was asked for their proxy.

133.     The May 1997 Board authorized Titín, as the Vice President of FSB, to sign a Joint Venture Agreement with Famas, Inc. for the purpose of developing the Cataño Land, and to sign all documents and agreements necessary for the transfer of such land to Infinity and its inscription in the Puerto Rico Property Registry.

134.     This transaction was riddled with conflicts of interest, which were consciously disregarded and intentionally concealed.   Freddie intentionally concealed, among others, the following conflicts of interests material to the Cataño Land Deal:

    a) that Famas did not yet exist or that he was, or was to become, a
       shareholder or director of Famas on or after May 30, 1997;

    b) that Titín was, or was to become, a shareholder or director of
       Famas on or after May 30, 1997;

    c) that Infinity did not exist or that he was, or was to become, a
       shareholder or director of Infinity on or after May 30, 1997;

    d) that his law firm had represented or would be representing Infinity
       as client, and that it would be drafting the deed documents by
       which the Cataño Land would be transferred to Infinity;

    e) that Martinal had provided or would be providing property
       management services to Infinity;

    f) that Titín was or was to become a shareholder or director of
       Infinity on or after May 30, 1997.

135.     Famas was ultimately incorporated on May 30, 1997, and its initial directors were Freddie, Federico ("Friedel") Stubbe Arsuaga (Freddie's business partner, who also happens to

be a cousin of MASH), and Titín.  Famas shares the same principle place of business as Martinal in the building housing Freddie's Law Firm.

136.    Infinity was also incorporated on May 30, 1997, and its initial directors were Freddie, Friedel, and Titín.  Infinity shares the same principal place of business as Martinal.

137.    In reality, Titín had no meaningful understanding of the Cataño Land Deal, and may not even have known that he was named a director of Famas and/or Infinity.

138.    The May 1997 FSB Board Meeting resolution authorizing the Cataño Land Deal was in direct contravention of Puerto Rico law, which requires in the case of such a conflict of interest, the full disclosure of the conflict, the approval of a majority of <u>non-interested</u> directors, and a showing of reasonableness of the underlying transaction.  At the May 1997 FSB Board Meeting, Freddie made no such disclosures, the only non-interested Director present was the 93-year old Doña Amelia.  Further, even with complete disclosures of the potential for self-dealing, or without any self-dealing at all, it was reckless to cause a charitable foundation to enter into a risky, speculative commercial real estate development project.  The failure to comply with the basic requirements of Puerto Rico law rendered the Cataño Land Deal null and void or voidable.

139.    Nevertheless, on May 30, 1997, FSB and Infinity signed the agreement to transfer the Cataño Land styled as a "Deed of Capital Contribution" (the "Deed").  The Deed was drafted by Freddie's Law Firm.  It was signed and executed by Titín (on behalf of FSB) and by Friedel (on behalf of Infinity) before Cristian Bernaschina Bobadilla, a law partner at Freddie's Law Firm.  The Deed states that "FSB being a partner of Infinity deems it advisable to transfer and convey the Property to Infinity as a capital contribution to Infinity, in exchange for shares of capital stock of Infinity, subject to the following terms and conditions:  one – any property taxes on the Property owed, or assessed from this date hereon, are the sole responsibility of Infinity . . .

40

Fifth – For the sole purposes of this transfer, the value of the property is fixed at TWO HUNDRED THOUSAND DOLLARS ($200,000), Sixth – Infinity acquires title to, and enters into possession of the Property, without any further formality or request other than the execution of this Deed."

140.    As of the date of the April 2006 appraisal "prepared for Mr. Alfredo Martínez Álvarez, Martinal Real Estate Corp.," the registration of the Cataño Land under Infinity's was still pending.  Indeed, Infinity did not seek publicly to record its title until September 2005.

1.    ***Freddie, Quiñones-Coll, and Freddie's Law Firm recognize and attempt to undo and reason away the tripartite conflicts of interest that made the Cataño Land Deal illegal***

141.    Years after the Cataño Land Deal had been "approved" by the FSB Board Freddie, Quiñones-Coll and Freddie's Law Firm realized that they had a problem and started to cover their tracks.  The multiple conflicts of interest and patent illegality of the transfer of land from FSB to Infinity was analyzed in depth by Freddie and Quiñones-Coll.  In an undated memorandum regarding FSB, Freddie, Quiñones-Coll, and Freddie's Law Firm expressly acknowledge the numerous conflicts of interests casting doubt on the legality of the transaction (the "Conflicts Memo").  Anticipating being confronted with their illegal actions the Conflicts Memo proposed mechanisms for papering Freddie's illegal acts and creating a record of obtaining from FSB an *ex post facto* waiver or ratification of the undisclosed conflicts.

142.    Among other admissions made in the Conflicts Memo, Freddie, Quiñones-Coll and Freddie's Law Firm recognized that:

a)   A "direct conflict" existed because the property was transferred from FSB to Infinity in a transaction in which "members" (presumably shareholders or directors) of both corporations participated "simultaneously on both sides of the transaction."

b)   A so-called "indirect conflict" existed because a corporate official was negotiating with himself ("interlocking"), and because a

corporate official has "some kind of investment in an entity that contemplates entering into a contract or transaction with the corporation."

    c)  As with any director, Freddie owed a fiduciary duty to the corporation, including the duty to conduct himself in accordance with the law and the objects and purposes of the corporation, by the prudent and diligence exercise of his duties, and with loyalty and for the benefit of the corporation and its shareholders.

    d)  Freddie's obvious breach of these obligations would give rise to director and officer's liability to the corporation.

143.    Notwithstanding these admissions, the Conflicts Memo purports to offer various false, after-the-fact escape valves from liability for Freddie's and Freddie's Law Firm's involvement in negotiation and papering the Cataño Land Deal.

144.    First, the Conflicts Memo suggested that the FSB Board should be informed regarding any direct or indirect conflicts, and that the FSB Board waive and ratify, *some eight years after the fact*, the illegal transaction.  It recommended  that the conflicted directors (who could not vote) attend the meeting for purposes of meeting the quorum requirements.

145.    Second, the Conflicts Memo suggested that full disclosure be made to "the shareholders" of FSB and that the majority of the disinterested shareholders approve the transaction.

146.    Third, the Conflicts Memo, raises the possibility of protecting themselves by arguing the reasonableness of the transaction if the approval of the disinterested directors or shareholders was found lacking and subject to court challenge.  According to the Conflicts Memo, courts will look at two aspects:  (i) the reasonableness of the negotiations (the course of conduct of the parties, disclosures, and approvals by the directors and shareholders), and (ii) the reasonableness of the price established by the contract, the assets, the market value, future profits

42

and any other factor that can affect the value of the company's shares.  The Cataño Land Deal failed both prongs the reasonableness test postulated by the Conflict's Memo.

147.    The Conflicts Memo concludes, in short order, that the Cataño Land Deal remained "subject to the ratification" of the majority of the FSB Board's non-interested directors and/or shareholders, but that in any event, and without any economic analysis, that "the transaction would prevail in the case of a challenge under the reasonableness test."

148.    Additionally, the Conflicts Memo offered a fourth escape valve:  the corporate opportunity doctrine.  The corporate opportunity doctrine, according to the self-serving and nonsensical reasoning of the Conflicts Memo, would be triggered due to the potential prejudice to FSB if it did not enter into the Cataño Land Deal with Infinity, and if instead, FSB entered into a deal with "one of its members in his personal capacity."

149.    In an undated, hand-written note, Freddie asked his law partner Quiñones-Coll to review and comment on the Conflicts Memo, such that it could be "seen together" by both of them.

150.    Freddie followed through with the recommended action items outlined in the Conflicts Memo.  In an FSB Board Meeting on August 26, 2005 (the "August 2005 FSB Board Meeting"), Freddie sought to clean his hands of the numerous conflicts of interest undermining the validity of the Cataño Land Deal, by obtaining the ratification and approval of the FSB Board.

151.    Freddie, as Secretary of the FSB Board who drafted the meeting minutes, sought to classify the August 2005 FSB Board Meeting as "ordinary."  It was nothing ordinary.  First, Freddie obtained a waiver from all of the FSB Directors to the prior notification requirement, in an attempt to minimize any advanced notice and due diligence regarding the Cataño Land Deal

by the disinterested Board members.  Second, MASH, a disinterested Director, was unavailable to attend the August 2005 FSB Board Meeting.  Freddie did not postpone the meeting, but rather accepted that MASH would provide Doña Mildred with a proxy, including for purposes of voting on board action.

152.    In the August 2005 FSB Board Meeting minutes drafted by Freddie "recounted" how the FSB Board had approved the Cataño Land Deal whereby FSB and Famas each received 50% of Infinity's shares.  Freddie purported to disclose at that time (eight years later) that he was a 20% shareholder of Famas, and that "all of the FSB Board Members" (which is not true, as Doña Mildred and Don Hermann were not in attendance at the time) agreed that the Cataño Land Deal would benefit FSB.  Also, in his standard manipulative pattern, Freddie explained that Friedel was his business partner in development projects before the Cataño Land Deal and that he brought Friedel's development team to this project "for the benefit of FSB."  Finally, Freddie noted that Famas had contributed over $200,000 in developing the Cataño Land and obtaining government permits, which he confessed had proved "very difficult to obtain."

153.    According to Freddie's August 2005 FSB Board Meeting minutes, all of the board members, except Freddie (who abstained), "approved and ratified all of the participations, transactions and activities that had been carried out regarding" the Cataño Land.  Further, the FSB Board in August 2005 authorized Titín to sign segregation and real estate purchase documents from September 1995, *almost ten years prior.*

154.    Freddie botched this blatant attempt to cover his tracks, leaving in its wake, a paper trail of deception.  First, at the August 2005 FSB Board Meeting, Freddie concealed once again that he was not only a shareholder, but a director of Famas.  Second, Freddie concealed once again that he was a director of Infinity.  Third, Freddie concealed once again that Infinity

was a client of Freddie's Law Firm. Fourth and fifth, Freddie concealed once again that Titín (under his control) was also a director and/or shareholder of Famas and Infinity. Further, he failed to disclose his relationship with Titín Foundation and his longstanding scheme to cheat and defraud.

155.    Freddie made no mention of the fact that Famas and Infinity were housed within Martinal, which also managed FSB's property portfolio, and within the same building as Freddie's Law Firm, which was providing concurrent legal services to these entities, papering and notarizing the Cataño Land Deal.

156.    Finally, Freddie botched the ratification attempt by failing to obtain the majority vote of the disinterested FSB directors. Because of his concurrent membership on the Boards of FSB, Famas and Infinity, Titín was not a disinterested director. Because of his membership as a law partner at Freddie's Law Firm, which represented FSB and Infinity and provided legal services in the deal and the development, Quiñones-Coll was not a disinterested director. The only disinterested directors in the August 2005 FSB Board meeting were Don Hermann, Doña Mildred and MASH, which does not constitute a majority of the FSB Board, even if the interested directors (Freddie, Titín and Quiñones Coll) are to be counted for purposes of meeting the quorum requirements.

157.    Presuming, mistakenly, that Freddie had cleaned his hands from all wrongdoing in the August 2005 FSB Board Meeting, he proceeded to expend *FSB's money and resources* in pursuing fulfillment of the risky and speculative Grand Park Village development project. Toward that end, Freddie caused FSB to pay hundreds of thousands of dollars and possibly more[4] in "debts" allegedly owed to Famas under its Joint Venture Agreement with FSB. FSB

---

[4] Forensic expert assessment of FSB's business records and the extent of Defendant's financial manipulation of FSB's bank accounts and other assets will disclose other defalcations.

paid its "debts" to Famas by issuing substantial checks, typically in amounts of $25,000 and $50,000 signed by both Freddie and Alfie, from FSB's Banco Popular account managed by Martinal, to Infinity for "payment of contribution" or "payment of debt."

158.     In addition, Freddie caused FSB to repay 50% of Infinity's property taxes and other expenses, with the other 50% to be paid by Famas, even though FSB provided the underlying (and undervalued at the time) asset (and Infinity's only asset of any value).  Freddie also steered donations to conservation and community organizations in the Cataño area to garner support for the Grand Park Village development project.  Finally, Freddie and his son, Alfie, with the help of Freddie's Law Firm and Martinal, spent FSB's financial and political capital in order to obtain the necessary environmental and development permits, exchanging numerous letters posted in the U.S. mails and documents sent by interstate email, U.S. postal mails and interstate facsimile with federal and Puerto Rico governmental authorities.

159.     Ultimately, Freddie's enormous self-dealing efforts were all for naught because the portion of the Cataño Lands slated for the Grand Park Village were ultimately declared a wetland, dooming a project that proved to be too risky and speculative of a commercial bet, as corroborated by numerous official government reports regarding the Cataño Land.

160.     FSB was left 50% less of an owner of its original Cataño Land, and hundreds of thousands of dollars poorer.

**H.**     *Freddie secures ultimate control of the Family Wealth with Titín's Third Will*.

161.     Shortly thereafter, on September 8, 2005, a nearly 82-year-old Titín executed his third will ("Titín's Third Will").

162.     Titín's Third Will was prepared by Freddie or, on his instructions, by Freddie's Law Firm and executed before Notary Public Nelson Andres Pérez Surillo, another lawyer/notary employed by Freddie's Law Firm.

46

163.    Titín's Third Will again left a long list of small bequests to individuals (including grandnieces/nephews) and charities that included nominal bequests of $25,000.00 to each of his grandnephews/nieces.  It left nothing to his sister or FSB.

164.    Titín's Third Will again identified the Titín Foundation as his universal heir into which the bulk of his estate would be "poured."  Freddie and/or Quiñones-Coll partners of, and legal supervisors of, legal notary/attorney Andres Perez Surillo, already comprised the majority of the Board of Titín's universal heir.  They also controlled the employer of the witnesses to Titín's Third Will.

165.    Titín's Third Will again named Freddie as his executor with extremely broad powers to administer his estate, backed up, again, by Quiñones-Coll and Menéndez Cortada, both partners in Freddie's Law Firm.

166.    The witnesses to Titín's Third Will – Christine Cortés Keiser, Aida Lynn Pereira Valentin and Ramon Trinidad Ayala – were employees of Martinal, and beholden to Freddie.

167.    FSIC's 2006 Annual Report stated that FSIC had nearly $3 million in assets, $3 million in liabilities, and reserves of more than $15 million.

I.      ***Freddie hustles a diverse portfolio of self-dealings with the misuse of FSB's assets***.

168.    Not satiated by the misappropriation of FSIC from the Segarra-Boerman Family legacy, Freddie and his co-Defendants continued from 2005 to 2014 to fleece FSB through machinations designed to divert assets away from FSB and toward Freddie, Freddie's family members, and Freddie-controlled entities including the Titín Foundation.

J.      ***Freddie's daughter becomes executive director of the FSB Board.***

169.    At an August 26, 2005 FSB Board meeting, Dr. Herman Stubbe was named to the Board to replace his elderly father, Don Herman Stubbe, whose mental and physical health was

in rapid decline.  Dr. Herman Stubbe is a resident of Culpeper, Virginia and he received various communications in Virginia by U.S. mails and wires (including interstate telephone calls) from Defendants in furtherance of their scheme to cheat and to defraud.

170.    At a December 7, 2007 FSB Board meeting, Freddie recommended that his daughter, Sofia, be appointed executive director of FSB.  Sofia had been attending FSB Board meetings, invited by her father, as an *ad hoc* secretary to the Board for the alleged purpose of taking notes of the meetings.

171.    Plaintiffs, trusting Freddie's judgment and advice, agreed to the recommendation that was adopted by the Board.  Sofia was appointed as the executive director at this time, and became responsible for handling day-to-day charitable operations.  Possessing a law degree and having worked as a law clerk with an established Puerto Rican law firm, Sofía was aware of the duties and responsibilities of fiduciaries and her conflicts of interest obligations.  Sofía became aware of, and participated in Freddie's scheme and ignoring her conflicts of interests, and his, failed to resign or make proper disclosures.

**K.**    ***Freddie's brother-in-law receives another windfall brokerage fee.***

172.    From 2007 to 2009, thanks in large measure to the efforts of Dr. Herman Stubbe and MASH, FSB's operations became more transparent, structured and organized.  In 2009, an Executive Committee was formed.  The members of FSB's Executive Committee were Titín, Freddie, Quiñones-Coll, and MASH.

173.    At the December 2009 FSB Board Meeting, Freddie advised that FSB's investment account had been changed by the "Executive Committee" of the FSB Board from UBS to Merrill Lynch because José González Pumarada ("González Pumarada"), Freddie's brother-in-law and broker who had managed FSB's accounts from UBS from at least 2003 to 2009, had gone to work at Merrill Lynch.

174.    Doña Mildred as FSB's Treasurer at that time was not consulted on the change.

175.    It is customary in the brokerage industry for a broker who brings new business to a brokerage firm to be paid a substantial bonus of 1% to 1.5% of "production" (fees and commissions).   According to industry custom, González Pumarada must have been paid substantial sums (*i.e.*, approximately 1 to 1.5% of the transferred value) as bonuses after he moved from UBS to Merrill Lynch with the accounts of FSB, FSIC, and Titín Foundation.

176.    At the December 2009 FSB Board meeting, MASH opposed the *fait acompli* transfer of FSB's accounts from UBS to Merrill Lynch and objected to it.

177.    The Minutes of the December 2009 FSB Board meeting drafted by or under the instructions of Freddie, and mailed by U.S. posting or emailed in interstate commerce, at least in part, to directors, officers or administrators, intentionally and falsely failed to reflect MASH's objections to the transfer of FSB's accounts from UBS to Merrill Lynch.

178.    However, at the December 2009 FSB Board Meeting, the FSB Board voted that the Executive Committee had no authority to undertake unilateral actions of this nature and reserved for itself the authority to make them.   This was one of the few instances that the Board ever rebuffed Freddie.

179.    At the December 2009 FSB Board meeting, Viviana Stubbe-Figueroa ("Viviana"), the daughter of Dr. Herman Stubbe, was voted in as a director of FSB.  Viviana is a resident of Miami, Florida and communication with her by Defendants were by interstate wire or U.S. posting.  Dr. Herman Stubbe, MASH and Viviana's presence on the FSB Board did not deter Freddie, Sofía, Martinal, Alfie, Quiñones-Coll and other co-conspirators from engaging in self-dealing notwithstanding their pervasive undisclosed conflicts of interests.

L. ***Defendants steer money from FSB's accounts to charities in which they had an interest.***

180.    Defendants' self-dealings included FSB's "charitable" activities steered toward recipients with which Freddie and his confederates had a close relationship or expected return business.

181.    FSB made substantial grants and donations over the years, some legitimate and some that remain shrouded in mystery because Freddie purposefully concealed and failed to document them, and Sofía holds many of the communications.  Some examples include but are not limited to self-interested or *quid pro quo* grants and donations made to the following entities, individuals related to these entities, and other persons:

      a.  Colegio San Antonio de Abad – the school attended by Freddie's brother-in-law, González Pumarada;

      b.  Instituto Modelo de Enseñanza Individualizada ("IMEI") – a special needs school attended by Freddie's daughter;

      c.  Fundación Chana Goldstein & Samuel Levis, Inc. – a non-profit organization that a law partner at Freddie's Law Firm stated had promised to provide Freddie's Law Firm with legal and mortgage deed work, describing the "donation" (quotation marks in the original handwritten note) as a "good investment";

      d.  Cruz Roja Americana Puerto Rico – a non-profit organization on whose board Freddie sat;

      e.  The Tasis School in Dorado – an elite private school on whose board Freddie's law partner, José A. Menéndez-Cortada, and business partner, Friedel Stubbe, sat, and located near Freddie's residence, in a site developed by a company owned in part by Freddie and Friedel Stubbe;

      f.  Mariela Sanz Santini – the niece of Ana Maria Ramírez Legrand, an attorney formerly with Freddie's Law Firm;

      g.  Academia Sagrado Corazón, specifically for grants to benefit the daughters of Denny Batista Cuello – Sofía's personal hairstylist;

h.  Familias Capaces, Inc. – an organization devoted to victim-abuse services, with which Martinal had collaboration agreements calling for these services to benefit residents of housing projects administered by Martinal;

i.  Descubriendo Juntos, Inc. – an organization on whose board Freddie's sister, Marina Martínez-Álvarez, sat;

j.  The Universidad Interamericana de Puerto Rico[5] – the law school attended by Freddie and Sofía, who was accepted shortly after a substantial donation was made by FSB to the school;

k.  Numerous other schools attended by Freddie, Sofía and Freddie's family, which recognized their alumni relationship upon receiving donations from FSB;

l.  Numerous individuals who were employees or related to employees of Freddie, Freddie's Law Firm, Martinal and the co-Defendants; and

m.  Numerous residents of the public housing projects administered by Martinal, and for whom donations were sought by Martinal and its employees.

*See generally* **Exhibit A** to the Complaint.

182.  This pattern of self-aggrandizement (and probable corruption) was facilitated by easy access to FSB's purse by Freddie, Alfie, Sofía, and other co-conspirators who could draw checks from the foundation's bank accounts and make donations without seeking FSB Board approval.  As will be shown through further discovery in this case, several substantial donations were made without a formal FSB Board vote or approval.

---

[5] Indeed, the Universidad Interamericana's school newspaper ran an article featuring Freddie as a class of 1972 alumnus credited with making a donation to the law school on behalf of "a foundation of which he is a member and that wishes to remain anonymous," including a photo of Freddie presenting the check to the University President and Law School Dean.  The article proceeds to explain, according to Freddie, that the donation was largely due to a meeting Freddie had with a law professor and former Law School Dean who "planted a seed *in him* . . . which bore fruit with a first donation" to the Universidad Interamericana.

**M.**   *Freddie stole goods and services paid for by FSB to third party vendors.*

183.   Freddie and Freddie-controlled entities enjoyed goods and benefits provided by contracts ostensibly signed between FSB and third party vendors.  Sofía was instrumental in effectuating this additional scheme, the details of which remain in the hands of the Defendants.

184.   For example, in May 2014, Sofia, as executive director of FSB, signed a contract with Felix J. Perez Pereira to provide IT Administration services for monthly payments of $430. Sofia was not authorized by the FSB Board to sign this contract.

185.   Worse, these unauthorized IT Administration services were used for the benefit of Martinal, whose computer systems were secured and maintained under this FSB contract.

186.   Additionally, FSB paid for over $10,000 in computer and technology equipment purchased from this third party vendor for use by Martinal in its business.

187.   FSB only discovered this corrupt arrangement – the signing and payment of a contract by FSB to provide IT services for Martinal, a for-profit entity – when computer equipment for which FSB had no need was delivered to FSB's office.

188.   Other examples of self-serving gluttony will likely surface through discovery in this litigation of information now in the hands of, or in the control of, the Defendants.

**N.**   *Freddie used confusingly similar letterhead and logos and commingled FSB's funds to benefit himself and a secret foundation.*

189.   While Defendants kept the existence of the Titín Foundation secret from the FSB Board, they cavalierly treated both FSB and Titín Foundation as interchangeable entities to the detriment of FSB.  Numerous letters sent by U.S. mails or interstate fax by Freddie and Sofía to recipients of charitable donations reveal how those donations were delivered jointly, and how often recipients viewed Freddie as the ostensible source, or at least administrator, of those funds. *See generally* **Exhibit A** to the Complaint.

190.    For example, on one occasion, on August 26, 2014, Sofía inadvertently sent a letter by the U.S. mails to the school IMEI *on the Titín Foundation's letterhead*, although the letter purported to enclose *FSB's donations* in excess of $30,000 to IMEI, a school once attended by Freddie's daughter.   Notwithstanding Sofía's attempt to correct her mistake by requesting IMEI to destroy and replace the letter with a correct version on FSB's letterhead, a copy was maintained in FSB's files.

191.    Defendants' scheme to dominate and plunder FSB and Titín Foundation is also evidenced in the logos, symbols, and insignias that Defendants created for both foundations (although FSB has since changed its logo).   The images of Martinal and Freddie's business company logo, a Roman portico, as seen in the sequence below, were included in those of the foundations and designed to confuse the public and pass off the services of one entity as the services of another:



192.    Upon information and belief, Defendants also commingled the funds and identities of Titín Foundation with other family foundations that have fallen victim to their fraudulent scheme to retain exclusive control of the foundations' operations and assets. Specifically, the museum that was created and maintained by the Méndez-Bagur Foundations, the Museo de Arte y Diseño Miramar ("MADMi"), has a website that appears to be hosted and financed, at least in part, by the Titín Foundation, as can be seen from the screen shots of that website site below:



©2016 MADMi, TITIN FOUNDATION

*See* http://www.madmi.org/.

**O.    *Freddie dilutes The Segarra-Boerman Family's voice on the FSB Board*.**

193.    After Viviana's appointment, five of the seven Directors of FSB were members of the Segarra-Boerman nuclear family, namely, Doña Mildred, Titín, MASH, Dr. Herman Stubbe, and Viviana Stubbe ("the Segarra-Stubbe Directors").  The other two, non-family FSB Board members were Freddie and Quiñones-Coll.

194.    During the meeting of the FSB Board held on May 21, 2012, the Board voted to increase the number of directors permitted by the FSB's By-Laws from seven to eleven, because newly-effective Puerto Rico regulations for non-profit organizations prohibited boards from having more than 50% of its directors from the same nuclear family of the person who establishes, or who is one of the principal executive officers of, the organization, or who holds the president's position of the Board.

195.    At the May 2012 FSB Board meeting, various persons were nominated to be new directors and members of the FSB Board.  The Segarra-Stubbe Directors nominated two non-family directors, and Freddie, Quiñones-Coll and Titín (under Freddie's control) nominated two other non-family directors.  All were elected, and served.

**P.    *The Whitewash Report***

196.    Between late August and the beginning of December 2012, a consultant to non-profits known to Freddie from his previous consulting work at a Puerto Rican educational institution, Douglas White, was approved by the Board of FSB to conduct an evaluation of the foundation.  The prior relationship of Mr. White and Freddie was unknown to the other Board members.  Mr. White conducted interviews, evaluated FSB processes and prepared a report (the "Whitewash Report").  The Whitewash Report, the results of which were cynically manipulated by Freddie, Quiñones-Coll, Sofia, Alfie and Freddie's brother-in-law Gonzalez-Pumarada, simply fulfilled Defendants' agenda, and providing them cover for continuing to undermine family relationships, to pillage FSB while thwarting discovery of Defendants' overarching scheme to defraud Plaintiffs of the Segarra-Boerman Family wealth through acquiring and maintaining control over the entities in which the wealth was entrusted.

197.    Freddie, Quiñones-Coll, Sofia, Alfie and Gonzalez-Pumarada were among those interviewed in depth.  Freddie and Titín were interviewed on the same day, if not together.  Mr. White spent a substantial amount of additional time with Sofia, and corresponded with her by interstate emails.

198.    The Whitewash Report devotes a number of pages to the subject of "Conflicts of Interests."  Three are identified and a fourth suggested.  Significantly, the Whitewash Report did not identify Defendants' personal financial conflict of interests (and their long term plan for obtaining control of the Segarra-Boerman Family wealth) and their business conflict of interest

inherent in their hidden concurrent service as officers, executive director and Board members for a rival foundation, the Titín Foundation.  These conflicts were concealed from, or knowingly overlooked by, Mr. White to hide those conflicts from the Plaintiffs and Segarra-Boerman Family members.

199.    Nor does the Whitewash Report mention, much less address, any of the conflicts of interest inherent in Freddie's Law Firm acting as FSB's principal lawyers and housing FSB, to the financial remuneration of Freddie and Quinones-Coll.  Nor does the Whitewash Report mention or address Freddie's Law Firm simultaneous representation of the adverse interests of FSB, FSIC, the Titín Foundation and certain FSB Board members, individually.  These conflicts were concealed from, or intentionally overlooked by, Mr. White in order that the conflicts would continue to be concealed from Plaintiffs.

200.    The Whitewash Report does identify as a conflict Martinal's, and Alfie's, conduct of extensive real estate management duties while Alfie's father, Freddie, is an FSB Board member and blithely concludes: "But, this is one [conflict] that can be managed."  Notably, the Whitewash Resort fails to identify or mention as a conflict of interest Freddie's ownership of Martinal.

201.    The Whitewash Report identifies as the second conflict of interest that FSB's executive director, Sofia, is also the daughter of FSB Board member, Freddie, and acknowledges that this conflict is "intensified because her office is next to her father's, whose law firm houses the foundation's office."  But, "it too can be managed."  The Whitewash Report then undertakes to recommend increasing Sofia's compensation by "50% to 100%"!

202.    The third supposed conflict was described by Mr. White as Alexandra acting as a contractor to FSB for marketing and grant visits while being the daughter of a Board member,

MASH.  The Whitewash report concluded that "this conflict could be managed" but went on to admonish Alexandra only to report to Sofia, and both MASH and Alexandra "to abide by a process that keeps away any board member interference."  This undeserved reproach – not leveled at Freddie and Sofia - bolstered and gave legitimacy to Defendants' efforts to control FSB, hide their scheme and conceal their wrongdoing from Plaintiffs.

203.   The Whitewash Report identified a fourth potential conflict as a request by a Board member, MASH, to allow her son at UBS to make a presentation to the Board, together with the President of the UBS office, on why FSB's investment accounts should return to UBS, where they had been for many years before they moved to Merrill Lynch with Gonzalez-Pumarada.  The Whitewash Report notes that FSB's investment accounts nonetheless remained with Gonzalez-Pumarada.

204.   Significantly, the Whitewash Report makes no mention of the fact, and long existing conflict of interest, that Gonzalez-Pumarada is Freddie's brother-in-law. Nor does the Whitewash Report address the fact that FSB's liquid investments had been transferred each time Gonzalez-Pumarada moved to a new broker-dealer without Board discussion and to Gonzalez-Pumarada's great financial benefit.  This long-standing conflict was concealed from, or intentionally overlooked by, Mr. White who became a willing or at least an unwitting tool of the Defendants to perpetuate their scheme on Plaintiffs.

205.   The Whitewash Report's obvious purpose to wrap the dross of Defendants' undue influence and conflicts of interest in a patina of propriety, becomes even clearer.  While acknowledging that "some could characterize the relationship [between Freddie and Titín] (because it goes back a number of years) as a conflict of interest, it is not."  Notwithstanding the fact that Titín had suffered a debilitating stroke several years before, had been confined to a

wheel chair under the constant attendance of nurses since then, his financial affairs, including access to his accounts, were completely under Freddie's control, he was 89 and clearly nearing death (which happened within seven months), the Whitewash Report found no problem with Titín having "overtly relied upon a non-family member to coordinate his wishes with the rest of the board."  The Whitewash Report gives Freddie a "pass" on this role he assumed for himself because "the relationship goes back for decades" and then cynically congratulates him on his "job" well done.

206.   The Whitewash Report parrots the false and debilitating Iago-like theme created by Freddie to justify his actions, drive a wedge in the family, and unduly influence a vulnerable Titín, that the family did not "get along well."  For this reason the Whitewash Report presents the "structural option" to "[d]ivide the foundation [FSB] into two smaller foundations" split between family members.  Freddie immediately acted on this 'advice' from a so-called "external observer" in his final attempt to sweep up as much of the Segarra-Boerman family wealth into the funnel for his competing foundation, currently under his secret control, before Titín passed away[6].

## Q.   *Freddie's failed March 2013 attempt to divide and conquer FSB.*

207.   On January 15, 2013, Freddie, on behalf of FSB, with Quiñones-Coll again acting as FSB treasurer, signed a new enrollment with Merrill Lynch, allowing Freddie's brother-in-law González Pumarada as a new broker at Merrill Lynch to invest $10,709,177.00 of FSB's assets.

208.   Freddie's brother-in-law, González Pumarada, again reaped substantial bonuses for bringing such a large account to Merrill Lynch.

---

[6] The Whitewash Report compiles a "list of activities that family foundations should avoid or undertake with care" including:  "Self-Dealing," 'Satisfying Personal Pledges,"   "Hiring Family Members," "Board Compensation," "Grants to Organizations that Aren't Charities." Then it notes without further elaboration of any sort that "[w]hile some of these are not issues at Segarra-Boerman, some are."  This intentionally ambiguous but ominous comment provided Freddie with a perfect "apple of discord" for use against the Segarra-Boerman Family, including Titín.

209.    In February 2013, MASH, prompted by her increasing suspicion regarding Defendants' and their confederates' multiple conflicts of interest to the detriment of FSB, searched and discovered in the records with the Puerto Rico government a reference to a non-profit foundation named L. F. Segarra, Inc., listing Titín, Freddie and Quiñones-Coll as directors. She also discovered that FSB director Antonio Ochoa ("Ochoa") was serving as the treasurer of FSIC.  She advised Dr. Herman Stubbe, a director and the treasurer of FSB, of this discovery. Dr. Herman Stubbe immediately inquired of Freddie, Quiñones-Coll, Sofía and the other Board members of FSB about this foundation, the undisclosed relationship of Ochoa and reminded them of the need for transparency in such matters.  He did not receive a response.

210.    On March 1, 2013 a special board meeting was held.  Doña Mildred did not attend and Titín left early.

211.    Following-up on the manipulative and scripted conclusions of the Whitewash Report, at the March 1, 2013 FSB Board meeting, Quiñones-Coll read a letter allegedly written by Titín proposing a division of FSB's assets (the "March 2013 Offer").  It was either written by Freddie or by Quiñones-Coll under Freddie's direction.

212.    Quiñones-Coll intentionally failed to provide a copy of Titín's supposed letter to the other members of the FSB Board and a copy was not attached to the minutes of the March 2013 meeting, even though the minutes, drafted by Sofia and/or Freddie, purported to do so.

213.    The March 2013 Offer proposed to divide FSB – the foundation established with the heart and soul and money of his father and mother, Don Felipe and Doña Amelia – with Titín's sister, Doña Mildred.

214.    It proposed that Doña Mildred keep 80% of FSB's "investment" portfolio and incorporate her own foundation, and that Titín retain 20% of FSB's investment portfolio and all of FSB's real properties, and retain control of FSB.

215.    This proposed division of Doña Mildred and Titín's interests in FSB was one more example of the pattern of Freddie's machinations aimed at driving a wedge between the siblings in order to split their jointly held interests, and increase and consolidate his control over Titín's interests.  This proposal had a similar design to the buy-out of Doña Mildred's half of FSIC, orchestrated by Freddie and his confederates; it was history repeating or attempting to repeat itself.

216.    Quiñones-Coll fraudulently omitted from his March 2013 Offer to the other FSB Board members that Freddie and he were officers and directors of Titín Foundation and that Titín Foundation would inherit all of FSB's remaining assets if Doña Mildred and the FSB Board accepted the March 2013 Offer.

217.    Freddie and Quiñones-Coll were directors of FSB and Sofía was its executive director.  They owed a fiduciary duty to disclose all conflicts and self-interest in any proposal to the FSB Board.

218.    When the March 2013 Offer was presented to the FSB Board, neither Freddie nor Quiñones-Coll disclosed to any of the Segarra-Stubbe Directors that he was an officer and a director of Titín Foundation.

219.    When the March 2013 Offer was presented, Freddie did not disclose that Martinal was providing services for fees to the Titín Foundation.  Neither did Freddie disclose that his son, Alfie, was or had been an officer and a director of the Titín Foundation.

220.    When the March 2013 Offer was presented, Sofía did not disclose her conflicting executive director position with the Titín Foundation.

221.    Neither Freddie, nor Quiñones-Coll disclosed to any of the Segarra-Stubbe Directors that they had undertaken the preparation of Titín's Third Will, that Freddie had been named executor of Titín's Third Will, that Freddie and Quiñones-Coll would be in total control of FSIC, Titín Foundation, and (if Doña Mildred were to accept this offer) FSB upon Titín's death.

222.    Neither Freddie nor Quiñones-Coll disclosed to any of the Segarra-Stubbe Directors that upon Titín's death, they planned ultimately to divert the overwhelming majority of the Segarra-Boerman Family wealth through Titín's Third Will to Freddie's own purposes.

223.    According to the minutes, in reaction to this proposal, Dr. Herman Stubbe questioned the involvement of the Martinez-Alvarez family in the foundation and the proposal.

224.    Instead of making a full disclosure of all of his, and Defendants', pervasive conflicts of interests, their activities adverse to the interests of Plaintiffs, and their long-standing underhanded scheme to seize most of the Segarra-Boerman Family wealth upon Titín's death, Freddie engaged in a long protesting soliloquy to the "new" members of the FSB Board about his, Martinal's and Sofia's many years of labors on behalf of FSB.  He blamed the existence of the March 2013 Offer on the false assertions of conflicts and problems among family members, which were created and fostered by Freddie. He shamelessly and falsely claimed that he had always been very jealous and careful to ensure the interests of FSB over any other considerations and wrapped himself in the approval he had received in the Whitewash Report to deflect any further questions or suspicions.

225.     Neither Quiñones-Coll nor Sofia made any attempt in that meeting, or after, to disclose their, or any other Defendants', conflicts of interests.  They stood complicit and mute behind Freddie's dissembling and deflective remarks.

226.     Having gotten wind of the proposal at the March 2013 FSB Board meeting, Doña Mildred, through her son Dr. Herman Stubbe, was adamant *that under no circumstances* would she *ever* divide the foundation, FSB, which had been established by her parents, Doña Amelia and Don Felipe Segarra, for the benefit of the people of Puerto Rico.

227.     At the March 2013 FSB Board meeting, the Freddie-controlled members of the FSB Board did not have sufficient votes to approve the March 2013 Offer.

228.     Accordingly, to save face, and pretend to act in accordance with his hypocritical protestations of honor and commitment to putting the Segarra-Boerman Family's interest first, when the March 2013 Offer was brought to a vote, Freddie and Quiñones-Coll, grudgingly voted against accepting it.  According to the minutes drafted by Sofía and/or Freddie, in order to determine Titín's vote, Freddie "would talk to the President, Luis Felipe Segarra, with respect to [his vote regarding the March 2013 Offer]."  This was followed by Quiñones-Coll's self-serving and manipulative statement that "we have to assume that, as the President submitted the [March 2013 Offer], he voted in favor of it."  Since the chips did not fall in Freddie and Quiñones-Coll's favor, they evidently made no further inquiries to determine Titín's actual vote regarding the March 2013 Offer, which was, in reality, conceived by Freddie and Quiñones-Coll.

**R.     *Freddie's unauthorized confirmation of FSB's $10 million brokerage account*.**

229.     On December 26, 2012, Freddie and Quiñones-Coll, acting as FSB officers (Quiñones-Coll acting as treasurer, even though Dr. Herman Stubbe was the *actual* treasurer elected by the Board), executed another Client Agreement with Merrill Lynch through González Pumarada as its broker.

230.    The Client Agreement with Merrill Lynch was executed *without* the approval of FSB's Finance Committee's and without the knowledge or approval of FSB's Board, contrary to the December 2009 FSB Board resolution establishing that only the FSB Board may approve transfers of accounts.

231.    During the March 1, 2013 Board meeting, the Finance Committee recommended, and the non-family members of the Board ratified, the relationship with Merrill Lynch.

### S.    *When Titín dies, Freddie actively conceals Titín's fraudulently-rigged Third Will*.

232.    On July 10, 2013, Titín died.  The Titín Foundation did not place an obituary for its ostensible founder and sole funder, Titín.  Freddie and Quiñones-Coll purposefully avoided this customary acknowledgement to avoid any disclosure of the contents of Titín's Third Will to FSB or any members of the Segarra-Boerman Family.

233.    Freddie, as executor of Titín's Estate, proactively prevented and delayed any disclosure of the contents of Titín's Third Will to the Plaintiffs and other members of the Segarra-Boerman family.

234.    There was no reading of Titín's Third Will after his death.

235.    Freddie shared no details of Titín's Third Will with the surviving Segarra-Boerman Family members or the FSB Board or any of the Segarra-Stubbe Directors.

236.    Freddie rejected repeated inquiries by the Segarra-Stubbe Directors as to the disposition of Titín's Estate.

237.    However, Freddie assiduously worked to protect the fulfillment of his grand scheme to defraud by approaching or having employees of his law firm approach, Titín's grandnieces and grandnephews with offers to pay over the $25,000 bequests in return for a release or an "accordance satisfaction agreement," agreeing not to contest Titín's will.

238.     On or about late 2013 to early 2014, the Segarra-Stubbe Directors and Doña Mildred discovered, through their own due diligence and that of family members, that Titín's Estate would pour over, by Freddie's design, into the Titín Foundation that Freddie now controlled.

**T.     *The FSB Board confronts Freddie, who hisses: "Me importa un bledo, es mas, me apesta."***

239.     Several months before Plaintiff's discovery of the scheme to defraud, on August 23, 2013, FSB held an extraordinary meeting of its Board of Directors and Dr. Herman Stubbe was elected president of the FSB Board; Doña Mildred was elected vice president; Freddie was elected second vice president; MASH was elected treasurer; Quiñones-Coll was elected sub-treasurer; and Viviana was elected secretary.   Further, Ambassador Hertell was nominated to serve on the FSB Board and became a member of the FSB Board.

240.     A meeting of the FSB Board was held on December 12, 2013 at which Freddie resigned as the second vice president of FSB, but did not resign as a director or member.

241.     Freddie's daughter, Sofía, was the executive director of FSB, which position she had held since around 2007.   Shortly after the December 2013 FSB Board Meeting, Freddie executed forms that gave Freddie and his daughter, Sofía, access to FSB's accounts at Merrill Lynch.

242.     Unbeknownst to Plaintiffs FSB, Doña Mildred and the Segarra-Boerman Family, Freddie was readying the Titín Foundation to receive its funding – all the assets of Titín's Estate including FSIC.   On April 3, 2014, the Puerto Rico tax authority (*Hacienda*) gave Freddie – in his role as either Titín's executor or as the Titín Foundation's president and treasurer – a tax

waiver for Titín's Estate, because the proceeds went into Titín Foundation, a not-for-profit entity at the time.[7]

243.    On May 13, 2014, Quiñones-Coll, as secretary of Titín Foundation, executed a Certificate of Corporate Resolution changing its resident agent from Titín to Freddie.

244.    On May 30, 2014, Quiñones-Coll, as secretary of Titín Foundation, executed a Certificate of Corporate Resolution changing "L. F. Segarra, Inc." to "Titín Foundation, Inc." The name change would allow Freddie and his co-Defendants to disassociate the Titín Foundation from the Segarra-Boerman Family and compete against FSB for recognition in its own right, with the ultimate objective of letting history forget that the Titín Foundation, now held and controlled by Freddie and his co-Defendants, has anything to do with the Segarra-Boerman Family.

245.    Dr. Herman Stubbe and the remaining members of the Segarra-Boerman Family on the FSB Board became concerned about the conduct of his childhood friend, Freddie, and his confederates.

246.    On August 21, 2014, members of the Segarra-Boerman Family, including Doña Mildred, MASH, Ambassador Hertell, and Dr. Herman Stubbe (via interstate phone) met with Freddie at his offices.

247.    At this meeting, Freddie was informed that the family no longer trusted him, and he was asked to resign from FSB in all his capacities.

248.    Freddie again dissembled and refused to let go of his day-to-day control of FSB, refused to answer or provide any information regarding Titín and his will.  In fact, he treated the Segarra-Boerman Family members with utter contempt, with his final remark being: ". . . *me importa un bledo, es mas, me apesta*." "I don't give a damn, in fact, screw this."

---

[7] The Titín Foundation was treated as a for-profit corporation during at least the 2006, 2008 and 2009 fiscal years.

U.     *Freddie leaves FSB's Board slinging accusations and writing more unauthorized checks*.

249.   A meeting of the FSB Board was held on August 28, 2014.

250.   During this meeting, FSB Board President Dr. Herman Stubbe opined that the Segarra-Stubbe Directors had to confront Freddie over what had been recently learned and his unwillingness to resign.

251.   At and after the August 2014 FSB Board Meeting, for the first time, the remaining members of the Segarra-Boerman Family (following Titín's death), realized that Freddie had surreptitiously stolen nearly the entire Segarra-Boerman Family wealth via decades of fraudulent conduct, cheating, conflicts of interest, lies, distortions, manipulations, undue influence, breaches of fiduciary duty, abuses of professional relationships, and myriad chicaneries by which a trusted lawyer in charge of corporate boards, financial accounts and testamentary wills might fleece clients.

252.   Freddie requested that the Segarra-Stubbe Directors present except Dr. Herman Stubbe as the Chair excuse themselves from the meeting, so that the matters raised by the Segarra-Stubbe Directors could be discussed outside their presence.

253.   After the Segarra-Stubbe Directors other than Dr. Herman Stubbe left the August 2014 FSB Board meeting, director Carolina Nevares suggested that all of the FSB directors should resign so that FSB could function better under the guidance of the Segarra-Stubbe Directors.  Mrs. Nevares' suggestion was followed by the other directors.

254.   Carolina Nevares resigned as a director of FSB by mailing by U.S. posting a letter dated September 2, 2014, to Dr. Herman Stubbe.

255.   On September 9, 2014, Dr. Herman Stubbe received a letter mailed by U.S. posting to him on the letterhead of FSB notifying him of the resignations of directors who had

supported Freddie, namely:   Jaime Figueroa, Walter Tischer, Freddie, Quiñones-Coll, and Antonio Ochoa (the "Freddie Directors").

256.   In the September 2014 mass resignation letter, the Freddie Directors made a number of false allegations so as to cover-up why they had resigned.

257.   Freddie audaciously asserted that he had no obligation to inform Dr. Herman Stubbe, the FSB Board or any members of the FSB Board about Titín's dealings, in particular the creation of the Titín Foundation, under the ethically and legally indefensible rationale that it was Titín's obligation and not Freddie's.   This assertion is patently incorrect and demonstrated Freddie's continuously craven appreciation of his fiduciary duties.

258.   Obviously concerned with their own malfeasance liability exposure, the resigning Freddie Directors asked Dr. Herman Stubbe that they be maintained as insured parties on FSB's Directors and Officers Insurance.

259.   Cornered and exposed, the resigning Freddie and his supportive directors attempted to spin a perverse narrative by falsely accusing the Segarra-Stubbe Directors of wanting total control of the operations of FSB instead of simply good, faithful and selfless non-family directors on the Board.

260.   FSB was created and funded only by the Segarra-Boerman Family.   At no time did Freddie or Quiñones-Coll *ever* fund FSB or participate in the creation or ownership of either FSB or the creation of the Segarra-Boerman Family wealth.

261.   Significantly, FSB director Carolina Nevares resigned separately from the Freddie Directors without making the false accusations made by them in their September 2014 mass resignation letter.

262.    At the September 19, 2014 FSB Board meeting, the resignations of the Freddie Directors and of Carolina Nevares were accepted.

263.    At that meeting, six (6) new, non-family directors were named to FSB's Board.

264.    Also at that meeting, Alexandra, the daughter of MASH and Ambassador Hertell, was named FSB executive director and MASH was named auxiliary secretary.

265.    At the September 19, 2014 FSB Board meeting, the FSB Board revoked all signatory authority that Freddie, Quiñones-Coll, Miguel Quiñones (Quiñones-Coll's brother and an executive at Martinal), Alfie, and Sofía had to access and sign checks for FSB.

266.    Dr. Herman Stubbe mailed by U.S. posting the Freddie Directors and Carolina Nevares a letter dated September 19, 2014, accepting their resignations, effective on September 15, 2014, and rejecting the allegations contained in their September 2014 mass resignation letter.

267.    On September 22, 2014, MASH, acting in her capacity as treasurer of FSB, sent Martinal a letter by U.S. posting terminating the Martinal Administration Contract.

268.    In or about September 2014, Sofía resigned as executive director of FSB; she did not submit a written resignation.

269.    Even though she was not fired or laid off, because the extent of her participation in the scheme to defraud was then unknown, Sofía received a bonus of $33,846.08 and a "mesada" from FSB with the Segarra-Stubbe Directors' approval.  Significantly, after Freddie resigned as an officer from the FSB Board – and, therefore, was no longer authorized to sign checks for FSB – he and his son, Alfie, signed two FSB checks for the "mesada" payable to his daughter, Sofia, on September 22, 2014, one for $3,510.00 (check no. 4731) and the other for $26,639.35 (check no. 4732). These checks were cashed through the banks that cleared through the Federal Reserve System.

270.    They also signed an FSB check to pay a supplier of computers he had ordered for Martinal's use, but which to this day sit in their boxes at FSB's office.  These checks were cashed through the banks that cleared with the Federal Reserve system.

**V.**    ***Freddie puts the finishing touches on the coup and takes control of $50.3 million***.

271.    Sometime after Titín's death in July 2013, Titín's Estate was declared to have (presumably in accordance with the accounting supervised by its executor, Freddie) more than $56.5 million in assets, as stated in a *Hacienda* filing ("Anejo C Caudal Relicto" – "Detalle de Otros Bienes").

272.    On June 4, 2015, the Titín Foundation submitted its 2014 Annual Report.

273.    In its 2014 Annual Report, the Titín Foundation listed Freddie as its resident agent, treasurer, and president, and stated that its business volume was less than $3 million, however, ***its assets and capital added up to $50.3 million.***   All of these assets came from the Segarra-Boerman Family wealth, for Titín had never worked nor derived any income from work.

274.    In its subsequent 2015 Annual Report, the Titín Foundation listed assets and capital of $40.3 million, a precipitous drop of $10 million in one year.  Despite the evaporation of 20% of the foundation's holdings, the 2015 Annual Report failed to explain what happened to the money.  Defendants will have to explain in this proceeding this sharp difference.

275.    Freddie and/or Freddie's Law Firm prepared and executed a document entitled Restated and Amended Certificate of Incorporation of Felipe Segarra Investment Corporation dated November 16, 2015.  By this new FSIC Charter, Freddie completed his corrupt coup, was designated the new president of FSIC (and Quiñones-Coll its new secretary), and assumed total control of the valuable companies created and funded by Don Felipe through his long hard work and charitable intent.

69

### W.   *Freddie reigns over the Segarra-Boerman Family's wealth with self-aggrandizing flare.*

276.   With unfettered control over FSIC and the Titín Foundation, Freddie and his confederates have unrestrained access to what was and still should be the Segarra-Boerman Family wealth.  In the short time since receiving the bulk of that wealth, Freddie continues to exploit it for his great economic and social benefit.

277.   The Titín Foundation often carried out its business as a *for*-profit corporation.  Specifically, in 2006, 2008, and 2009, the Titín Foundation filed its annual reports with the Puerto Rico government expressly as a *for*-profit corporation.

278.   Martinal and Alfie provide managerial and administrative services for the assets of the Titín Foundation and FSIC.  Alfie, in fact, has acted as Vice President and Sub-Treasurer of the Titín Foundation.

279.   Publicly available information shows that since taking over the currently $40 million plus foundation Freddie has steered charitable donations to causes that self-promote or benefit him or his family and that have no real nexus to the charitable and testamentary intent of the Segarra-Boerman Family, including Titín.

280.   For example, the Titín Foundation was listed as an "annual campaign donor" to the Alport Syndrome Foundation ("ASF"), providing $1,000 "in loving memory of the Martinez-Alvarez family," according to the ASF's website.  *See* https://alportsyndrome.org/Doñate/annual-campaign-donors/.

281.   According to the same ASF website, Freddie's daughter, Tere Martínez-Álvarez, and her sons suffer from this disease, and hosted a fundraising event where they raised over $10,000.  Presumably, the Titín Foundation was used to pay for the event and raise some of those funds.

282.     The Titín Foundation is seeking to raise its profile in a self-aggrandizing manner diametrically-opposed to the low-profile manner characteristic of FSB and the original Segarra-Boerman Family's approach to humility and charity.

283.     The Titín Foundation, for example, recently sponsored the Festival of the Word (*Festival de la Palabra*) event in July 2016 that was headlined by the famed Lin-Manuel Miranda of Broadway's *Hamilton*.

284.     The Titín Foundation submitted an amicus brief on behalf of certain Puerto Rican charities before the Supreme Court of the United States in a case regarding the constitutionality of Puerto Rican legislation concerning the bankruptcy of public entities.  Freddie appears in the media and newspaper reports, speaking about this case, on behalf of the Titín Foundation.  Titín Foundation has taken over an entire floor in Freddie's building.

285.     Titín Foundation's self-benefiting charitable donations and self-aggrandizing activities are further indication that the original Segarra-Boerman Family wealth, since stripped, is being put to work for Freddie and the co-Defendants.

286.     In a 2015 study on non-profits in Puerto Rico, co-sponsored by the Titín Foundation and published by the Flamboyan Foundation, the Titín Foundation is listed as a "family foundation," shares Martinal's office address and identifies Sofia as its executive director and point of contact.  This report defines a "family foundation" as a "private foundation established by an individual or a family.  Generally some members of the family serve as officers or members of the board of the foundation and participate in the decisions on the adjudication of funds."

287.     No surviving relative of Titín, or other descendant of the Segarra-Boerman Family, is involved in any capacity with the Titín Foundation.

## V.    CAUSES OF ACTION

**A.    Legal Allegations Common To All RICO Counts**.

288.    Defendants engaged in multiple violations of the federal mail fraud and interstate wire fraud statutes prohibiting "schemes to defraud" where fraud is "representational" and where the fraud amounts to "cheating" without representations.  "Cheating" here violated basic standards of moral uprightness, fundamental honesty, fair play, and fair dealing in the general and business life of the members of society.  Defendants' conduct violated the federal mail fraud and interstate wire fraud statutes in both ways.

289.    Freddie, Quiñones-Coll, Alfie, Sofía, Freddie's Law Firm, and Martinal (collectively, the "RICO Defendants"), including FSIC and the Titín Foundation, as noted below, defrauded and conspired with one another to defraud FSB, Doña Mildred, and others of their property and assets, that included use of the mail and interstate wires.  FSB, Doña Mildred and FSIC (until taken over by the RICO Defendants) were the targets of the RICO Defendants' and the Titín Foundation's violations of law and their unlawful scheme to acquire and maintain control of the entities in which the Segarra-Boerman Family wealth, was entrusted, including FSB and FSIC.  The RICO Defendants, including FSIC and the Titín Foundation, as noted below, implemented their scheme to acquire and maintain control of the entities in which Segarra-Boerman Family wealth was entrusted through fraud and manipulation in connection with FSIC and the Estate of Titín and subsequently the Titín Foundation that was under the control of Freddie and Quiñones-Coll.  The scheme also constituted an unfair business practice, and interference with business relationships, by a charitable foundation, law firm, and controlling individuals that was adverse to the interests and reasonable expectations, and family plan of

funding, of FSB and its business of charitable giving by Doña Mildred and the other holders of the Segarra-Boerman Family wealth.

290.    The RICO Defendants, including FSIC and Titín Foundation, as noted below, engaged in an unlawful and intentional scheme to defraud (i) FSB, Doña Mildred, and others through intentional misrepresentations and omissions (on the part of persons under a legal duty to speak with full candor) and (ii) FSB and Doña Mildred by cheating them to acquire and maintain property from her and to acquire and maintain the entities in which the wealth of the Segarra-Boerman Family had been entrusted, first through control of FSB and subsequently FSIC.  In addition, the RICO Defendants agreed and conspired between and among themselves to achieve these goals.  During this scheme to defraud and the conspiracy, they also schemed and agreed that they would, and did, abuse Freddie's, Quiñones-Coll's, Freddie's Law Firm, and Sofia's fiduciary, legal, and professional obligations to FSB, FSIC, Doña Mildred, and others, including Titín, make false representations, in particular, to the Segarra-Boerman Directors, Segarra-Stubbe Directors, and Titín, each a Director of FSB and/or FSIC, and then insinuated the prospect of economic and embarrassing family problems to Doña Mildred, personally, to cause her to cede her control.

291.    FSB, Doña Mildred, and others, reasonably and justifiably relied upon FSIC and the RICO Defendants' intentional misrepresentations and omissions (on the part of persons under a legal duty to speak with full candor) and took as creditiable their false manipulations of Doña Mildred's trust that proximately caused injury to their business and property.

292.    Freddie, FSIC, and the Titín Foundation, together with Freddie's Law Firm devised a scheme to obtain the property of Doña Mildred and FSB, through cheating and cozening Doña Mildred's consent to sell her interest in FSIC through exploiting economic

vulnerability, use of lies, undue influence and abuse of trust. Doña Mildred, an elderly person, was concerned with the rightful pursuit of her economic interests, the care of her aging wheel-chair bound husband, and the management of her family's charitable giving plan and purposes; she had the right to be free of such illegal conduct. Through their abusive and fraudulent scheme, executed over many years, that included several months of self-created problems, confusing claims of embarassing family discord and gross breaches of their fiduciary duties, Freddie, FSIC, the Titín Foundation, together with Freddie's Law Firm, ultimately acquired and now maintain, by control of the entities to which it has been entrusted, FSIC and others, the property of Doña Mildred and FSB, to which they had no lawful claim, through inherently unlawful means.

293.    FSB's and Doña Mildred's RICO claims arise out of the injuries and damages suffered by them by reason of the conduct of a "pattern of racketeering activity" within 18 U.S.C. § 1961(5) by FSIC, the Titín Foundation, and the RICO Defendants in violation of 18 U.S.C. §§ 1962 (a) - (d) by 18 U.S.C. § 1341 (mail fraud) and § 1343 (interstate wire fraud) that proximately caused those injuries and damages.

294.    FSIC, the Titín Foundation and the RICO Defendants' violations of 33 L.P.R.A. § 3022 (1974) (criminal fraud), 33 L.P.R.A. § 5534 (1974) (conspiracy to defraud), 33 L.P.R.A. § 4838 (2004) (fraud), 31 L.P.R.A. § 3408 (2004) (deceit), 33 L.P.R.A. §§ 4877-78 (2004) (conspiracy), 32 L.P.R.A. § 3352t and 14 L.P.R.A. §3563-64 (breach of fiduciary duty), show an intent to defraud and manifest by their duration, their similarity, and their persistence, a regular way of doing business by FSIC, Titín Foundation and the RICO Defendants and conduct of the affairs of a series of "enterprises" within 18 U.S.C. § 1961(4), including FSB when under Defendants' control, and it continues to this date through the Titín Foundation and its subsidiary,

FSIC. This conduct also constituted "cheating" that violated basic standards of moral uprightness, fundamental honesty, fair play, and fair dealing in the general and business life of the members of society.

295.    Freddie's Law Firm, FSIC, the Titín Foundation and Martinal each acted as an "enterprise" within 18 U.S.C.§ 1961(4), but not as a defendant, as defined and specifically alleged in certain RICO causes of actions, below, and as defendant and an "enterprise," as defined and specifically alleged in other specific RICO causes of action, below.

296.    FSIC, the Titín Foundation and the RICO Defendants' "pattern of racketeering activity" within 18 U.S.C. § 1961(5)  consisted of the commission of numerous "racketeering activities" within18 U.S.C. § 1961(1) in violation of 18 U.S.C. §§ 1962 (a) - (d), by 18 U.S.C. § 1341 (mail fraud), and 18 U.S.C. § 1343 (interstate wire fraud) as well as violations of 33 L.P.R.A. § 3022 (1974) (criminal fraud), 33 L.P.R.A. § 5534 (1974) (conspiracy to defraud), 33 L.P.R.A. § 4838 (2004) (fraud), 31 L.P.R.A. § 3408 (2004) (deceit), 33 L.P.R.A. § 4877-78 (2004) (conspiracy), 32 L.P.R.A. § 3352t, and 14 L.P.R.A. §3563-64 (breach of fiduciary duty). The references to Puerto Rico law are included to show intent and regular way of doing business by the Defendants in the operation of "enterprises" within 18 U.S.C.§ 1961(4) and not for the purpose of establishing substantive liability.

297.    18 U.S.C. § 1341 provides:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting to do so, places in any post office or authorized depository for mail matter, any matter or thing

whatever, to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both.

298.    The RICO Defendants, including FSIC and the Titín Foundation, below, through, and acting in, the affairs of certain "enterprises," below, committed mail fraud in violation of 18 U.S.C. § 1341, that included placing in U.S. post offices or in authorized depositories for mail, and taking and receiving from them, and knowingly causing items to be delivered by U.S. mail (particularly before the advent of the Internet and subsequently email, in the 1970s and 1980s), including letters, billing for services, cashing checks received for billed services, notices of corporate meetings, including minutes of meetings of FSB's and FSIC's Board of Directors, bank statements, brokerage statements, corporate correspondence, including formal offers to acquire interests and companies, resignation letters, offers of intent, among Plaintiffs and various of the RICO Defendants, including FSIC, the Titín Foundation, and later by interstate wire (email). Plaintifs are not yet in possession of each of these communications.  They are in the hands of the RICO Defendants, FSIC and the Titín Foundation.  Plaintiffs reasonably expect to obtain them through court supervised or ordered discovery.  Attached as **Exhibit A** is a list of some of those communications.

299.    The RICO Defendants, including FSIC and the Titín Foundation, below, engaged in a "pattern of racketeering activity" within 18 U.S.C. § 1961(5) constituted in part by mail fraud within 18 U.S.C.§ 1341, as incorporated in 18 U.S.C.§ 1961(1), that is a pattern in the use of U.S. mails to execute their scheme to defraud FSB and defraud and cheat Doña Mildred, and others, by acquiring and maintaining control over Plaintiff's property, FSIC, the the Estate of Titín and subsequently the Titín Foundation, and subsequently avoiding the recovery by FSB and Doña Mildred of their rights to Plaintiffs' property in connection with the concealment of Titín's

First Will, Titín's Second Will, Titín's Third Will, and Freddie's role in the creation of them and as the executor of each; the creation of the Titín Foundation; the deceitful and cheating conduct in the FSIC Buyout of Doña Mildred, including the RICO Defendants' role in the FSIC Buyout, the so-called independent accountant's valuation, for the attempted buyout of Doña Mildred's interest in FSB; and the constant, similar, and persistent violations of Freddie's, Quiñones-Coll's, Sofia's and Freddie's Law Firm's fiduciary obligations to FSB and its Board, and Doña Mildred.

300.    The RICO Defendants, FSIC and the Titín Foundation used the U.S. mails in the execution of their scheme to defraud and to cheat and to acquire and maintain control over the Titín Foundation and the entities to which the Segarra-Boerman Family wealth was entrusted, FSB and FSIC.   The RICO Defendants, and FSIC and Titín Foundation, below, would have continued their scheme and conspiracy indefinitely unless discovered by Plaintiffs or now ended by the action of this Court.

301.    18 U.S.C. § 1343 provides:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communications in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

302.    The RICO Defendants, including FSIC and the Titín Foundation, through, and acting in the affairs (management and operation) of certain "enterprises," below, committed "racketeering activity" within 18  U.S.C.§ 1961 (1) by the violation of interstate wire fraud within 18 U.S.C.§ 1343  by the use of interstate wires or emailing numerous communications through sending or causing to be sent, or interstate wired  numerous documents regarding the affairs of FSB and FSIC to Defendants, to Plaintiffs, and directors of FSB and FSIC, in particular

to Dr. Herman Stubbe in Virginia, to Viviana Stubbe in Florida, and to MASH in the Dominican Republic, where her husband, Hans H. Hertell, served as the United States Ambassador, and faxes of instructions to financial institutions, transfers of funds, checks, and self-described valuations.  Plaintifs are not yet in possession of each of these communications.  They are in the hands of the RICO Defendants, FSIC and the Titín Foundation.  Plaintiffs reasonably expect to get them through court supervised discovery.  Attached as **Exhibit A** is a list of some of those communications.

303.    The RICO Defendants, including FSIC and the Titín Foundation, below, engaged in a long-term pattern of "racketeering activity" within 18 U.S.C.§ 1961(1) constituted in part by wire fraud within 18 U.S.C. § 1343. The RICO Defendants, and FSIC and Titín Foundation, below, would have continued their scheme and conspiracy indefinitely unless discovered by Plaintiffs or now ended by the action of this Court.

304.    The RICO Defendants, including FSIC and the Titín Foundation, below, engaged in multiple, repeated, and continuous acts of mail fraud and interstate wire fraud that constituted a "pattern of racketeering activity" under 18 U.S.C. § 1961(5).

305.    The RICO Defendants', including FSIC's and the Titín Foundation's, pattern of "racketeering activity" within 18 U.S.C.1961(1), including mail and wire fraud threatened to continue indefinitely until Plaintiffs discovered it and will not end until this Court stops it.

**B.**     **The Nine Causes of Action Under RICO**.

## FIRST CAUSE OF ACTION

**[AGAINST THE RICO DEFENDANTS (EXCEPT
FREDDIE'S LAW FIRM) FSIC, THE TITÍN FOUNDATION
FOR VIOLATIONS OF 18 U.S.C. § 1962(c)]**

306.    The allegations contained in paragraphs 1 through 305 are realleged and incorporated.

307.    18 U.S.C. § 1962(c) provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity ...

308.    FSB and Doña Mildred are each a "person" within 18 US.C. §§ 1961(3) and 1964(c), "an entity capable of holding a legal or beneficial interest in property," and  was injured by reason of the "racketeering activity" within 18 U.S.C.§ 1961(1) of the RICO Defendants, FSIC and the Titín Foundation.

309.    Each of the RICO Defendants, FSIC, and the Titín Foundation is a "person" under 18 U.S.C. §§ 1961(3) and 1962(c), and "an entity capable of holding a legal or beneficial interest in property."

310.    Under of this cause of action under 18 U.S.C. § 1962(c), Freddie's Law Firm is not a defendant.

311.    Freddie's Law Firm is an "enterprise" within 18 U.S.C. §§ 1961(4) and 1962(c) ("Law Firm Enterprise") that was engaged in, and the activities of which affected, interstate commerce within of 18 U.S.C. §§ 1961(4), 1962(c).

312.    Each of the RICO Defendants, FSIC and the Titín Foundation was employed by, or associated with, or participating in the affairs of, law partners acting jointly as officers and

directors of FSB, FSIC, the Titín Foundation, and with the Law Firm Enterprise, for the same purposes of benefiting all, and they conducted and participated, directly or indirectly, in the management and operation of the affairs of the Law Firm Enterprise, in particular with respect to their targets FSB, FSIC (until acquired by the RICO Defendants and Titín Foundation) and Doña Mildred, through a "pattern of racketeering activity" within 18 U.S.C. §§ 1961(1), and (5) and § 1962(c), in particular:  multiple, repeated, and continuous violations of 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1343 (interstate wire fraud).

313.    FSIC, the Titín Foundation and the RICO Defendants' violations of 33 L.P.R.A. § 3022 (1974) (criminal fraud), 33 L.P.R.A. § 5534 (1974) (conspiracy to defraud),  33 L.P.R.A. § 4838 (2004) (fraud), 31 L.P.R.A. § 3408 (2004) (deceit), 33 L.P.R.A. § 4872-78 (2004) (conspiracy), and 32 L.P.R.A. § 3352t, and 14 L.P.R.A. §§ 3563-64 (breach of fiduciary duty), show an intent to defraud and manifest by their duration, their similarity, and their persistence, a regular way of doing business in connection with the management and operation of the Law Firm Enterprise by FSIC, the Titín Foundation and the RICO Defendants, but not for the purpose of establishing liability and damages or other relief under Puerto Rican law.

314.    FSB, Doña Mildred, and others, justifiably relied on the intentional misrepresentations and omissions (on the part of persons under a legal duty to speak with full candor), and allowed Freddie and Quiñones-Coll to serve on the FSB and Freddie on the FSIC Board, and to act as officers of FSB and and Freddie of FSIC, and Sofia to act as an executive director of FSB, and for Freddie, Quiñones-Coll and for Freddie's Law Firm to act as attorneys for FSB, FSIC and Doña Mildred, and for Freddie, Alfie and Martinal to manage the business and funds of FSB and FSIC, to the profound detriment and the injury of the business and property of FSB and Doña Mildred by reason of their "racketeering activities" within 18 U.S.C.

80

§ 1961(1). In the case of Doña Mildred, she justifiably relied on the relationship of trust and manipulative recommendations of Freddie and Freddie's Law Firm causing her to give up her interests in FSIC to FSIC for the ultimate benefit of the real parties in interest, Freddie, Quiñones-Coll, and the Titín Foundation of which FSIC ultimately became its wholly owned subsidiary.

315.    Had FSB, Doña Mildred, and others, known that such representations and omissions (on the part of persons under a legal duty to speak with full candor) were false and part of a scheme to defraud, or had they not been subjected to such cozening and manipulative demands, they would have embarked on a different course of action, and taken the appropriate steps to safeguard and protect the property and business interests of Plaintiffs, and kept the Segarra-Boerman Family wealth from the greedy grasp of the RICO Defendants, FSIC and the Titín Foundation.

316.    These acts of mail fraud and interstate wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, by the Law Firm Enterprise, in particlar in mailing letters of Freddie, offers, letters of intent, closing documents, letters of resignation, its invoices to FSB, cashing checks received, mailing notices of meetings of the FSB Board, over many years, and mailing minutes of the meetings of the FSB Board, over many years, but in more recent years, the same communitions were transmitted by interstate wire to members of the FSB Board, for example to Dr. Herman Stubbe, in Virginia, and Vivianna Stubbe, in Florida, constituted a "pattern of rackeeting activity" within 18 U.S.C. § 1961(1) violation of 18 U.S.C. §§ 1961(1), 1962(c).  The "cheating" here also violated basic standards of moral uprightness, fundamental honesty, fair play, and right dealing in the general and business life of the members of society.

317.   By reason of these violations of 18 U.S.C. § 1962(c), FSB and Doña Mildred suffered (and will continue to suffer) substantial injury to their "businesses and property" within 18 U.S.C. § 1964(c) by reason of the violations of 18 U.S.C. § 1962(c), committed by the RICO Defendants, FSIC, and the Titín Foundation, especially by Freddie and Quiñones-Coll, including to unfair charitable business practices, interference with business relationships, lost or reduced charitable contributions and substantial and irreparable loss of goodwill and business opportunities for the Puerto Rican people, the intended recipients of FSB's charitable largesse. Plaintiffs plead the comprehensive scope of the injury to business and property of the Plaintiffs by the RICO Defendants, FSIC and the Titín Foundation for the benefit of the Court, but they seek only to recover for the injury to their "business and property" within 18 U.S.C.§ 1964(c).

318.   The RICO Defendants, FSIC and the Titín Foundation purposefully managed and operated the affairs of the Law Firm Enterprise by engaging in a "pattern of racketeering activity" within 18 U.S.C.§ 1961(5), in particular interstate wire fraud and mail fraud, in turn, for the purpose of increasing Freddie's Law Firm's revenue, profitability, and return on investment, to the financial detriment of FSB, Doña Mildred, and others, and also to the benefit of the RICO Defendants' various business activities, including FSIC and the Titín Foundation.

319.   The RICO Defendants, FSIC and the Titín Foundation acted knowing that these "racketeering activities" within 18 U.S.C. §§ 1961(1), 1962(c), 1964(c) would proximately and directly cause FSB, Doña Mildred, and others, to suffer these damages to their business and property within 18 U.S.C. § 1964(c). All of FSB's and Doña Mildred's damages were reasonably foreseeable by the RICO Defendants, FSIC and the Titín Foundation, and were anticipated as a substantial factor and a natural consequence of their pattern of "racketeering activity."

## SECOND CAUSE OF ACTION

**[AGAINST FSIC, THE TITÍN FOUNDATION, AND ALL RICO DEFENDANTS (EXCEPT FREDDIE'S LAW FIRM) FOR VIOLATION OF 18 U.S.C. § 1962(d) BY CONSPIRING TO VIOLATE 18 U.S.C. §1962(c)]**

320.    The allegations contained in paragraphs 1 through 305 of this Complaint are realleged and incorporated.

321.    18 U.S.C. § 1962(d) provides:

> It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

322.    FSB and Doña Mildred are each a "person" under 18 U.S.C. §§ 1961(3) and 1964(c), and each "an entity capable of holding a legal or beneficial interest in property" and was injured by reason of the "racketeering activity" within 18 U.S.C.§ 1961(1) of the RICO Defendants, FSIC and the Titín Foundation.

323.    Each of the RICO Defendants, FSIC and the Titín Foundation is a "person" under 18 U.S.C. §§ 1961(3) and 1964(c), and each is "an entity capable of holding a legal or beneficial interest in property."

324.    Freddie's Law Firm constitutes an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) ("Law Firm Enterprise"), that is, was engaged in, and the activities of which affecting, interstate commerce. Freddie's Law Firm is not a defendant in this count.  The RICO Defendants, FSIC and the Titín Foundation were employed by or associated with the management and operation of the affairs of Law Firm Enterprise.

325.    The RICO Defendants, FSIC and the Titín Foundation conspired among themselves within 18 U.S.C. § 1962(d) to conduct, operate, and manage the affairs of the Law Firm Enterprise, directly or indirectly, by engaging in a "pattern of racketeering activity" within 18 U.S.C. § 1961(5) to wit: the commission of "racketeering activities" within 18 U.S.C. §

1961(1) in violation of 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (interstate wire fraud).

326.    The RICO Defendants' violations of 33 L.P.R.A. § 3022 (criminal fraud),  33 L.P.R.A. § 5534 (conspiracy to defraud), 33 L.P.R.A. § 4838 (2004) (fraud), 31 L.P.R.A. § 3408 (2004) (deceit), 33 L.P.R.A. § 4872-78 (2004) (conspiracy), 32 L.P.R.A. § 3352t, and 14 L.P.R.A. §§ 3563-64 (breach of fiduciary duty), show an intent to cheat and defraud and manifest by their duration, their similarity, and their persistence, a regular way of doing business by the RICO Defendants, FSIC and the Titín Foundation of the affairs of the Law Firm Enterprise to the present day, but not for the purpose of establishing liability and damages under Puerto Rican law. The "cheating" here violated basic standards of moral uprightness, fundamental honesty, fair play, and right dealing in the general and business life of the members of society. Plaintiffs plead the comprehensive scope of the injury to business and property of the Plaintiffs by the RICO Defendants, FSIC and the Titín Foundation for the benefit of the Court, but they seek only to recover for the injury to their "business and property" within 18 U.S.C.§ 1964(c).

327.    The RICO Defendants, FSIC, and the Titín Foundation acted knowing that these "racketeering activities" within 18 U.S.C. §§ 1961(1), 1962(c), 1964(c) would proximately and directly cause FSB, Doña Mildred, and others, to suffer these damages to their "business and property" within 18 U.S.C. § 1964(c). All of FSB's and Doña Mildred's damages were reasonably foreseeable by the RICO Defendants, FSIC and the Titín Foundation and were anticipated as a substantial factor and a natural consequence of their pattern of "racketeering activity" within 18 U.S.C. § 1961(1).

## THIRD CAUSE OF ACTION

### [AGAINST THE RICO DEFENDANTS AND FSIC FOR VIOLATING 18 U.S.C. § 1962(c)]

328.    The allegations contained in paragraphs 1 through 305 are realleged and incorporated.

329.    18 U.S.C. § 1962(c) provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity ...

330.    FSB and Doña Mildred are each a "person" under 18 US.C. §§ 1961(3) and 1964(c), (d) "an entity capable of holding a legal or beneficial interest in property" and was injured by reason of the "racketeering activity" within 18 U.S.C.§ 1961(1) of the RICO Defendants and FSIC.

331.    Each of the RICO Defendants and FSIC is a "person" under 18 U.S.C. §§ 1961(3) and 1962(c), and "an entity capable of holding a legal or beneficial interest in property."

332.    For the purposes of this cause of action under 18 U.S.C. § 1962(c), the Titín Foundation is not a defendant.

333.    For the purposes of this cause of action under 18 U.S.C. § 1962(c), the Titín Foundation constitutes an "enterprise" within 18 U.S.C. §§ 1961(4) and 1962(c) ("Titín Foundation Enterprise").

334.    The Titín Foundation Enterprise is, was engaged in, and the activities of which affected, interstate commerce, in particular from 1999 through the present within 18 U.S.C. §§ 1961(4), 1962(c), and 1962(d).

335.    Each of the RICO Defendants and FSIC, which became the Titín Foundation's subsidiary in 2014, were and are officers, directors, executive administrators, managers employed by or associated with the Titín Foundation Enterprise and conducted and participated, directly or indirectly, in the management and operation of the affairs of the Titín Foundation Enterprise.  The affairs of the Titín Foundation Enterprise included the targeting of Segarra-Boerman Family wealth that was held by FSIC, FSB and Doña Mildred.  The targeting was implemented by a "pattern of racketeering activities" within 18 U.S.C. §§ 1961 (5) and § 1962(c), in particular violations of 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (interstate wire fraud).

336.    FSIC, and the RICO Defendants' violations of 33 L.P.R.A. § 3022 (criminal fraud),  33 L.P.R.A. § 5534 (conspiracy to defraud), 33 L.P.R.A. § 4838 (2004) (fraud), 31 L.P.R.A. § 3408 (2004) (deceit), 33 L.P.R.A. § 4872-78 (2004) (conspiracy), 32 L.P.R.A. § 3352t, and 14 L.P.R.A. §§ 3563-64 (breach of fiduciary duty) show an intent to cheat and defraud and manifest by their duration, their similarity, and their persistence, a regular way of doing business by FSIC, and the RICO Defendants in the affairs of the Titín Foundation Enterprise to the present day, but not for the purpose of establishing liability and damages under Puerto Rican law. The "cheating" here violated basic standards of moral uprightness, fundamental honesty, fair play, and right dealing in the general and business life of the members of society. Plaintiffs plead the comprehensive scope of the injury to business and property of the Plaintiffs by the RICO Defendants, FSIC and the Titín Foundation for the benefit of the Court, but they seek only to recover for the injury to their "business and property" within 18 U.S.C.§ 1964(c).

337.   FSB, Doña Mildred, and others, trusted and justifiably relied on the intentional misrepresentations and omissions (on the part of persons under a legal duty to speak with full candor) and the credibility of the manipulative and cheating statements by FSIC, Freddie, Quiñones-Coll, and Freddie's Law Firm to Doña Mildred, and allowed Freddie to serve on the FSIC and FSB Board, and Quiñones-Coll to serve on the FSB board, and Freddie to act as and officer of FSB and FSIC, and Quiñones-Coll as an officer of FSB, and Sofia as the executive director of FSB, and allowed Freddie's Law Firm to act as the lawyers for FSB, FSIC and Doña Mildred, and allowed Freddie, Martinal and Alfie to manage the real estate and funds of FSB and FSIC, all to the profound detriment of FSB and Doña Mildred. In the case of Doña Mildred, she justifiably rely on the credibility of the manipulative statements of FSIC, Freddie, Quiñones-Coll and Freddie's Law Firm into giving up her interests in FSIC to FSIC for the ultimate benefit of the real parties in interest, Freddie Quiñones-Coll, the Titín Foundation Enterprise and FSIC, its wholly owned subsidiary in 2014.

338.   Had FSB, Doña Mildred, and others known that such representations and omissions (on the part of persons under a legal duty to speak with full candor) were false, they would have embarked on a different course of action, and taken the appropriate steps to safeguard and protect themselves and the Segarra-Boerman Family wealth from the RICO Defendants and FSIC and their wrongful conduct and scheme for funding and enhancing the business of the Titín Foundation Enterprise.

339.   These multiple, repeated, and continuous acts of mail fraud and interstate wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, with express and implied verbal and written threats, fraudulent offers and letters designed to manipulate and cheat Doña Mildred into giving up her interests in FSIC to FSIC and in unduly influencing Titín into willing away his family

assets that were expected and intended to flow into FSB as part of the Founders' plan to fund FSB with the Segarra-Boerman Family assets to be used for FSB's charitable purposes, and with the mail and interstate wires used by the Titín Foundation Enterprise through its officers, directors, executive directors and lawyers, in particular Freddie, Quiñones-Coll and Sofia mailing false letters, offers, letters of intent, faxing transfer instructions, faxing supposedly independent accountants valuations, improperly making and mixing donations of Titín Foundation with, or in lieu of, donations by FSB, cashing checks received for them, mailing or emailing notices of meetings of the FSB and FSIC Boards, over many years, and mailing false minutes of the meetings of the FSB and FSIC Boards, over many years; and, in more recent years, the same type of communicatons were transmitted by interstate wire to members of the FSIC and FSB Boards, including, for example, Doña Mildred, Dr. Herman Stubbe, in Virginia, and Vivianna Stubbe, in Florida. The "cheating" here also violated basic standards of moral uprightness, fundamental honesty, fair play, and right dealing in the general and business life of the members of society.

340.    By reason of these violations of 18 U.S.C. § 1962(c), FSB and Doña Mildred suffered (and will continue to suffer) substantial injury to their "businesses and property" within 18 U.S.C. § 1964(c) by reason of the violations of 18 U.S.C. § 1962(c), committed by the RICO Defendants and FSIC, especially by Freddie, Quiñones-Coll, Sofía and Freddie's Law Firm, including unfair charitable business practices, interference with business relationships, lost or reduced charitable contributions and substantial and irreparable loss of goodwill and business opportunities for the Puerto Rican recipients of FSB's charitable largesse. Plaintiffs plead the comprehensive scope of the injury to business and property of the Plaintiffs by the RICO

Defendants and FSIC for the benefit of the Court, but they seek only to recover for the injury to their "business and property" within 18 U.S.C.§ 1964(c).

341.    The RICO Defendants and FSIC purposely managed and operated the Titín Foundation Enterprise by engaging in multiple "racketeering activities" within 18 U.S.C.§ 1961(1), that is, interstate wire fraud and mail fraud for the purpose of increasing the Titín Foundation Enterprise's and their own revenue, profitability, and return on investment to the financial detriment of FSB, Doña Mildred, and others, and to the benefit of the RICO Defendants' various business activities, including FSIC.

342.    The RICO Defendants and FSIC and acted knowingly that these "racketeering activities" within 18 U.S.C. §§ 1961(1), 1962(c), 1964(c) would proximately and directly cause FSB, Doña Mildred, and others, to suffer these damages to their "business and property" within 18 U.S.C. § 1964(c). All of FSB's and Doña Mildred's damages were reasonably foreseeable by the RICO Defendants and FSIC and were anticipated as a substantial factor and a natural consequence of their pattern of "racketeering activity" within 18 U.S.C. § 1961(1).

## FOURTH CAUSE OF ACTION

### [AGAINST ALL RICO DEFENDANTS AND FSIC FOR VIOLATION OF 18 U.S.C. § 1962(d) BY CONSPIRACY TO VIOLATE 18 U.S.C. § 1962(c)]

343.    The allegations contained in paragraphs 1 through 305 of this Complaint are realleged and incorporated.

344.    18 U.S.C. § 1962(d) provides:

It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

345.    FSB and Doña Mildred are each a "person" under 18 U.S.C. §§ 1961(3) and 1964(c),  "an entity capable of holding a legal or beneficial interest in property," and  were

injured by reason of the "racketeering activity" within 18 U.S.C.§ 1961(1) of the RICO Defendants and FSIC.

346.    Each of the RICO Defendants and FSIC is a "person" under 18 U.S.C. §§ 1961(3) and 1964(c), and each is "an entity capable of holding a legal or beneficial interest in property."

347.    The Titín Foundation constitutes an "enterprise" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c) ( "Titín Foundation Enterprise") that is, and was, engaged in, and the activities of which affected, interstate commerce. The Titín Foundation is not a defendant in this count.   The RICO Defendants and FSIC were employed by or assocated with and in the management and operation of the affairs of the Titín Foundation Enterprise.

348.    The RICO Defendants and FSIC conspired among themselves within the meaning of 18 U.S.C. § 1962(d) to establish conduct, operate, and manage the Titín Foundation Enterprise, directly or indirectly, by engaging in a "pattern of racketeering activity" within 18 U.C.S.§ 1961(5) by the commission of multiple, repeated, and continuous "racketeering activities" within 18 U.S.C.§ 1961(1) by 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (interstate wire fraud).

349.    FSIC's and the RICO Defendants' violation of 33 L.P.R.A. § 3022 (criminal fraud),  33 L.P.R.A. § 5534 (conspiracy to defraud), 33 L.P.R.A. § 4838 (2004) (fraud), 31 L.P.R.A. § 3408 (2004) (deceit), 33 L.P.R.A. § 4872-78 (2004) (conspiracy), 32 L.P.R.A. § 3352t, and 14 L.P.R.A. §§ 3563-64 (breach of fiduciary duty), show an intent to cheat and defraud and manifest by their duration, their similarity, and their persistence, a regular way of doing business by the RICO Defendants and FSIC in the affairs of the Titín Foundation Enterprise, to the present day but not for the purpose of establishing liability and damages under Puerto Rican law. The "cheating" here violated basic standards of moral uprightness,

fundamental honesty, fair play, and right dealing in the general and business life of the members of society. Plaintiffs plead the comprehensive scope of the injury to business and property of the Plaintiffs by the RICO Defendants, FSIC and the Titín Foundation for the benefit of the Court, but they seek only to recover for the injury to their "business and property" within 18 U.S.C.§ 1964(c).

350.   As a result of FSIC's and RICO Defendants' conspiracy and "racketeering activities" within 18 U.S.C. § 1961(1) pursuant to it, Plaintiffs have suffered substantial injury to their "business and property" within 18 U.S.C. § 1964(c).

351.   The RICO Defendants and FSIC purposely managed and operated the Titín Foundation Enterprise by engaging in multiple "racketeering activities" within 18 U.S.C.§ 1961(1), that is interstate wire fraud and mail fraud for the purpose of increasing the Titín Foundation Enterprise's and their own revenue, profitability, and return on investment to the financial detriment of FSB, Doña Mildred, and others, and to the benefit of the RICO Defendants' and FSIC's various business activities .

352.   The RICO Defendants and FSIC acted knowing that these "racketeering activities" within 18 U.S.C. §§ 1961(1), 1962(c), 1962(d), 1964(c) would proximately and directly cause FSB, Doña Mildred, and others, to suffer these damages to their "business and property" within 18 U.S.C. § 1964(c). All of FSB's and Doña Mildred's damages were reasonably foreseeable by the RICO Defendants and FSIC and were anticipated as a substantial factor and a natural consequence of their pattern of "racketeering activity" within 18 U.S.C.§ 1961(1).

## FIFTH CAUSE OF ACTION

### [AGAINST ALL RICO DEFENDANTS, TITÍN FOUNDATION AND FSIC FOR VIOLATION OF 18 U.S.C. §§ 1962(d) to 1962(a)]

353.    The allegations contained in paragraphs 1 through 305 of this Complaint are realleged and incorporated.

354.    18 U.S.C. § 1962(a) provides:

> It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or though collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, Unites States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

355.    18 U.S.C. § 1962(d) provides:

> It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section

356.    FSB and Doña Mildred is each a "person" under 18 U.S.C. §§ 1961(3) and 1964(c), "an entity capable of holding a legal or beneficial interest in property," and  was injured by reason of  the "racketeering activity" within 18 U.S.C. § 1961(1) of the RICO Defendants, FSIC and the Titín Foundation.

357.    Each of the RICO Defendants, FSIC, and the Titín Foundation is a "person" under 18 U.S.C. §§ 1961(3) and 1964(c), and each is "an entity capable of holding a legal or beneficial interest in property."

358.    Freddie's Law Firm constitutes an "enterprise" within 18 U.S.C. §§ 1961(4), 1962(a), 1962(d) ("Law Firm Enterprise") that is, and was, engaged in, and the activities of which affected, interstate commerce.

359.   FSIC constitutes an "enterprise' within 19 U.S.C. §§ 1961(4), 1962(a), 1962(d) ("FSIC Enterprise") that is, and was, engaged in, and the activities of which affected, interstate commerce.

360.   Titín Foundation constitutes an "enterprise" within  18 U.S.C. §§ 1961(4), 1962(a), 1962(d) ("Titín Foundation Enterprise") that is, and was, engaged in, and the activies of which affected, interstate commerce.

361.   The Titín Estate Enterprise constitutes an enterprise within 18 U.S.C. § 1961(4), 1962(a), 1962(d) ("Titín Estate Enterprise) that is, and was, engaged in, and the activities of which affected, interstate commerce.

362.   Martinal constitutes an "enterprise" within 18 U.S.C. §§ 1961(4), 1962(a), 1962(d) ( "Martinal Enterprise") that is, and was, engaged in, and the activies of which affected, interstate commerce.

363.   The RICO Defendants, FSIC and the Titín Foundation conspired among themselves within 18 U.S.C. §§ 1962(d) to 1962(a), to establish and operate, and use and invest income, or the proceeds of income, from a "pattern of racketeering activity" within 18 U.S.C. § 1961(5) in the Law Firm Enterprise, the FSIC Enterprise, the Titín Estate Enterprise, the Titín Foundation Enterprise, and the Martinal Enterprise, with the Segarra-Boerman Family wealth wrongfully obtained from Plaintiffs and Titín's Estate; to operate the Law Firm Enterprise, the FSIC Enterprise, the Titín Estate Enterprise, the Titín Foundation Enterprise, and the Martinal Enterprise, and obtain income in the form of legal fees (Freddie and Quiñones-Coll), executive director and management fees (Martinal, Alfie and Sofía), salaries and benefits (Alfie and Sofía), for the RICO Defendants, FSIC, Titín Foundation, directly or indirectly, from a "pattern of racketeering activity" within 18 U.S.C. § 1961(5), in which the RICO Defendants, FSIC, and the

Titín Foundation participated as principals within 18 U.S.C. §§ 1961(1), 1961(5), 1962(d) to 1962(a) including multiple, repeated, and continuous violations of 18 U.S.C. §§ 1962 (d) and 1962(a) by 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (interstate wire fraud).

364.   FSIC's, the Titín Foudation's, and the RICO Defendants' violations of 33 L.P.R.A. § 3022 (criminal fraud),  33 L.P.R.A. § 5534 (conspiracy to defraud), 33 L.P.R.A. § 4838 (2004) (fraud), 31 L.P.R.A. § 3408 (2004) (deceit), 33 L.P.R.A. § 4872-78 (2004) (conspiracy), 32 L.P.R.A. § 3352t, and 14 L.P.R.A. §§ 3563-64 (breach of fiduciary duty) show an intent to cheat and defraud manifest by their duration, their similarity, and their persistence, a regular way of doing business by FSIC, Titín Foundation, and the RICO Defendants of the affairs of the FSIC Enterprise, the Titín Foundation Enterprise, the Titín Estate Enterprise, the Law Firm Enterprise, and the Martinal Enterprise to the present day but not for the purpose of establishing liability and damages under Puerto Rican law. The "cheating" here violated basic standards of moral uprightness, fundamental honesty, fair play, and right dealing in the general and business life of the members of society. Plaintiffs plead the comprehensive scope of the injury to business and property of the Plaintiffs by the RICO Defendants, FSIC and the Titín Foundation for the benefit of the Court, but they seek only to recover for the injury to their "business and property" within 18 U.S.C.§ 1964(c).

365.   An object of FSIC, the Titín Foundation, and the RICO Defendants' conspiracy was and is that income, or the proceeds of income, and income producing assets, obtained from "racketeering activity" within 18 U.S.C. § 1961(1) received by the RICO Defendants, the Titín Foundation, and FSIC would be invested in or used in the establishment and operation of the Law Firm Enterprise, the FSIC Enterprise, Titín Estate Enterprise, Titín Foundation Enterprise, and the Martinal Enterprise. The Titín Foundation was established and operated as a competitor

to FSB, to funnel away funds from FSB and to aggrandize the RICO Defendants, the Titín Foundation and FSIC with Plaintiffs' assets to perpetrate the scheme to defraud on Plaintiffs.

366.   By reason of the RICO Defendants', FSIC's and the Titín Foundation's conspiracy and "racketeering activity" within 18 U.S.C. § 1961(1) pursuant to it, FSB suffered (and is suffering) substantial injuries to its business and property. As a family foundation, FSB's purpose was to receive the bulk of the Segarra-Boerman Family wealth, such as the real estate donation from Titín and expected future bequests, to make distributions of the Segarra-Boerman Family wealth in charitable donations under the supervision of Segarra-Boerman Family members, in particular Doña Mildred.  Doña Mildred suffered (and is suffering) substantial injuries to her "business and property" within 18 U.S.C. § 1964(c), in particular by being deprived of the opportunity to receive legal inheritances, to devise the Segarra-Boerman Family wealth to the family foundation and direct the charitable distributions of the family wealth accumulated by her parents in accordance with their wishes.

367.   The RICO Defendants, FSIC and the Titín Foundation acted knowing that these "racketeering activities" within 18 U.S.C. §§ 1961(1), 1962(d) to 1962(a), 1964(c) would proximately and directly cause FSB, Doña Mildred, and others, to suffer damages to their "business and property" within 18 U.S.C. § 1964(c). All of FSB's and Doña Mildred's damages were reasonably foreseeable by the RICO Defendants, the Titín Foundation, and FSIC and were anticipated as a substantial factor and a natural consequence of their pattern of "racketeering activity" within 18 U.S.C. § 1961(1).

## SIXTH CAUSE OF ACTION

## [AGAINST ALL RICO DEFENDANTS. TITÍN FOUNDATION, AND FSIC FOR VIOLATIONS OF 18 U.S.C. § 1962(b)]

368.    The allegations contained in paragraphs 1 through 305 of this Complaint are realleged and incorporated.

369.    18 U.S.C. § 1962(b) provides:

> It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

370.    FSB and Doña Mildred is each a "person" under 18 US.C. §§ 1961(3) and 1964(c), "an entity capable of holding a legal or beneficial interest in property," and  was injured by reason of (proximate cause) the "racketeering activity" within 18 U.S.C. § 1961(1) of the RICO Defendants, the Titín Foundation, and FSIC.

371.    Each of the RICO Defendants, the Titín Foundation, and FSIC is a "person" under 18 U.S.C. §§ 1961(3), 1962(b), and each is "an entity capable of holding a legal or beneficial interest in property."

372.    FSB is a corporation organized and existing under the laws of Puerto Rico and is an "enterprise" ("FSB Enterprise") an interest in and control of which was acquired and maintained by the RICO Defendants, the Titín  Foundation, and FSIC by a "pattern of racketeering" within 18 U.S.C. §§ 1961(5) and 1962(b) and is "an entity capable of holding a legal or beneficial interest in property."  The FSB Enterprise is, and was, engaged in, and the activies of which affected, interstate commerce.

373.    FSIC is a corporation organized and existing under the laws of Puerto Rico, which in 2014 became the wholly own subsidiary of Titín Foundation, and is an "enterprise" ("FSIC

Enterprise") that an interest in and control of which was acquired and maintained by the RICO Defendants and the Titín Foundation by a "pattern of racketeering" within 18 U.S.C. §§ 1961(5) and 1962(b) and is "an entity capable of holding a legal or beneficial interest in property." The FSIC Enterprise is, and was, engaged in, and the activies of which affected, interstate commerce.

374.    The Titín Estate is an estate organized and existing under the laws of Puerto Rico and is an "enterprise" ("Titín Estate Enterprise") that an interest in and control of which was acquired and maintained by the RICO Defendants, FSIC, and the Titín Foundation by a "pattern of racketeering" within 18 U.S.C. §§ 1961(5) and 1962(b) and is "an entity capable of holding a legal or beneficial interest in property." The Titín Estate Enterprise is, and was, engaged in, and the activities of which affected, interstate commerce.

375.    The RICO Defendants, the Titín Foundation, and FSIC in violation of 18 US.C. § 1962(b) acquired or maintained, directly or indirectly, an interest and control of the FSB Enterprise, the FSIC Enterprise, the Titín Foundation, and the Titín Estate Enterprise, by a "pattern of racketeering activity" within 18 U.S.C. § 1961(1), that is multiple, repeated, and continuous violations of 18 U.S.C. § 1962(b) by 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (interstate wire fraud).

376.    The RICO Defendants,' Titín Foundation's and FSIC's violations of 33 L.P.R.A. § 3022 (criminal fraud),  33 L.P.R.A. § 5534 (conspiracy to defraud), 33 L.P.R.A. § 4838 (2004) (fraud), 31 L.P.R.A. § 3408 (2004) (deceit), 33 L.P.R.A. § 4872-78 (2004) (conspiracy), 32 L.P.R.A. § 3352t, and 14 L.P.R.A. §§ 3563-64 (breach of fiduciary duty) show an intent to cheat and defraud manifest by their duration, their similarity, and their persistence, a regular way of doing business by the RICO Defendants of the affairs of FSB Enterprise, the FSIC Enterprise, the Titín Enterprise, and the Titín Estate Enterprise to the present day, but not for the purpose of

establishing liability and damages under Puerto Rican law. The "cheating" here violated basic standards of moral uprightness, fundamental honesty, fair play, and right dealing in the general and business life of the members of society. Plaintiffs plead the comprehensive scope of the injury to business and property of the Plaintiffs by the RICO Defendants, FSIC and the Titín Foundation for the benefit of the Court, but they seek only to recover for the injury to their "business and property" within 18 U.S.C.§ 1964(c).

377.    The RICO Defendants, FSIC, and the Titín Foundaton acted knowing that these "racketeering activities" within 18 U.S.C. §§ 1961(1), 1962(b), 1964(c) would proximately and directly cause FSB, Doña Mildred, and others, to suffer damages to their "business and property" within 18 U.S.C. § 1964(c). All of FSB's and Doña Mildred's damages were reasonably foreseeable by the RICO Defendants and FSIC and were anticipated as a substantial factor and a natural consequence of their pattern of "racketeering activity" within 18 U.S.C. § 1961(1).

378.    By reason of these violations, FSB and Doña Mildred have suffered (and are suffering) substantial injury to their "business and property" within 18 U.S.C. § 1964(c).

## SEVENTH CAUSE OF ACTION

**[AGAINST ALL RICO DEFENDANTS AND TITÍN FOUNDATION FOR VIOLATIONS OF 18 U.S.C. § 1962(d) FOR CONSPIRING TO VIOLATE 18 U.S.C. § 1962(b)]**

379.    The allegations contained in paragraphs 1 through 305 of this Complaint are realleged and incorporated.

380.    18 U.S.C. § 1962(d) provides:

It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

381.    FSB and Doña Mildred is each a "person" under 18 U.S.C. §§ 1961(3) and 1964(c), "an entity capable of holding a legal or beneficial interest in property," and  was injured

by reason of the "racketeering activity" within 18 U.S.C. § 1961(1) of the RICO Defendants, the Titín Foundation, and FSIC.

382.    Each of the RICO Defendants, the Titín Foundation, and FSIC is a "person" under 18 U.S.C. §§ 1961(3) and 1962(d), "an entity capable of holding a legal or beneficial interest in property."

383.    FSB is a corporation organized and existing under the laws of Puerto Rico and is an "enterprise" within 18 U.S.C. § 1961(4) ("FSB Enterprise"), control of which was taken over by the RICO Defendants, the Titín Foundation, and FSIC within 18 U.S.C. §§ 1961(4) and 1962(d) and is "an entity capable of holding a legal or beneficial interest in property." The FSB Enterprise is, and was, engaged interstate commerce, and its activities affected, interstate commerce.

384.    FSIC is a corporation organized and existing under the laws of Puerto Rico, which in 2014 became wholly owned subsidiary of the Titín Foundation, and is an "enterprise" within 18 U.S.C. § 1961(4) ("FSIC Enterprise"), control of which was taken over by the RICO Defendants and Titín Foundation within the meaning of 18 U.S.C. §§ 1961(4) and 1962(d), and "an entity capable of holding a legal or beneficial interest in property." FSIC Enterprise is, and was, engaged in, and the activities of which affected, interstate commerce.

385.    The Titín Estate is an estate organized and existing under the laws of Puerto Rico and is an "enterprise" ("Titín Estate Enterprise") that an interest in, and control of, was acquired and maintained by the RICO Defendants, FSIC, and the Titín Foundation by a "pattern of racketeering" within 18 U.S.C. §§ 1961(5) and 1962(b) and is "an entity capable of holding a legal or beneficial interest in property." The Titín Estate Enterprise is an estate and was engaged in, and the activities of which affected, interstate commerce.

386.    Each of the RICO Defendants, the Titín Foundation, and FSIC conspired within 18 U.S.C. § 1962(d) to violate 18 U.S.C. § 1962(b) to acquire or maintain control of, directly or indirectly, the FSB Enterprise, the FSIC Enterprise, and the Titín Estate Enterprise by a "pattern of racketeering activity" within 18 U.S.C. §§ 1961(1), that is  multiple, repeated, and continuous violations of 18 U.S.C. §§ 1962(b) by 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (interstate wire fraud).

387.    The RICO Defendants', the Titín Foundation's, and FSIC's "pattern of racketeering activity" within 18 U.S.C. § 1961(5), constituted of multiple, repeated, and continuous "racketeering activities" within 18 U.S.C. §§ 1962(b) by 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (interstate wire fraud).

388.    The RICO Defendants' the Titín Foundation's, and the FSIC's violations of 33 L.P.R.A. § 3022 (criminal fraud),  33 L.P.R.A. § 5534 (conspiracy to defraud), 33 L.P.R.A. § 4838 (2004) (fraud), 31 L.P.R.A. § 3408 (2004) (deceit), 33 L.P.R.A. § 4872-78 (2004) (conspiracy), 32 L.P.R.A. § 3352t, and 14 L.P.R.A. §§ 3563-64 (breach of fiduciary duty), show an intent to cheat and defraud and manifest by their duration, their complexity, and their persistence, a regular way of doing business by the RICO Defendants, the Titín Foundation, and FSIC of the affairs of FSB Enterprise, the FSIC Enterprise, and the Titín Enterprise, and the Titín Estate Enterprise to the present day, but not for the purpose of establishing liability and damages under Puerto Rican law. The "cheating" here violated basic standards of moral uprightness, fundamental honesty, fair play, and right dealing in the general and business life of the members of society. Plaintiffs plead the comprehensive scope of the injury to business and property of the Plaintiffs by the RICO Defendants, FSIC and the Titín Foundation for the benefit of the Court,

but they seek only to recover for the injury to their "business and property" within 18 U.S.C.§ 1964(c).

389.    The RICO Defendants, FSIC, and the Titín Foundaton acted knowing that these "racketeering activities" within 18 U.S.C. §§ 1961(1), 1962(b), 1964(c) would proximately and directly cause FSB, Doña Mildred, and others, to suffer these damages to their "business and property" within 18 U.S.C. § 1964(c). All of FSB's and Doña Mildred's damages were reasonably foreseeable by the RICO Defendants and FSIC and were anticipated as a substantial factor and a natural consequence of their pattern of "racketeering activity" within 18 U.S.C. § 1961(1).

390.    By reason of these violations, FSB and Doña Mildred have suffered (and are suffering) substantial injury to their  "business and property" within 18 U.S.C. § 1964(c).

## EIGHTH CAUSE OF ACTION

### [AGAINST FREDDIE, QUIÑONES-COLL, AND SOFIA FOR VIOLATIONS OF 18 U.S.C. § 1962(b)]

391.    The allegations contained in paragraphs 1 through 305 of this Complaint are realleged and incorporated.

392.    18 U.S.C. § 1962(b) provides:

> It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

393.    FSB and Doña Mildred is each a "person" under 18 U.S.C. §§ 1961(3) and 1964(c), "an entity capable of holding a legal or beneficial interest in property," and  was injured by reason of the "racketeering activity" within 18 U.S.C. § 1961(1) of Freddie, Quiñones-Coll and Sofia.

394.    Each of Freddie, Quiñones-Coll and Sofia is a "person" under 18 U.S.C. §§ 1961(3) and 1962(b), and "an entity capable of holding a legal or beneficial interest in property."

395.    The Titín Foundation is a corporation organized and existing under the laws for Puerto Rico and is an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(b) ("Titín Foundation Enterprise"), and "an entity capable of holding a legal or beneficial interest in property." The Titín Foundation Enterprise is, and was, engaged in, and the activities of which affected, interstate commerce.

396.    Freddie, Quiñones-Coll and Sofia, in violation of 18 U.S.C. § 1962(b),  as officers, directors and executive director, acquired or maintained, directly or indirectly, an interest and control of the Titín Enterprise, by a "pattern of racketeering activity" within 18 U.S.C. § 1961(1), through multiple, repeated, and continous violations of 18 U.S.C. § 1962(b), by 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (interstate wire fraud).

397.    Freddie's, Quiñones-Coll's and Sofia's "pattern of racketeering activity" within 18 U.S.C. § 1961(5) consisted  of the commission of numerous "racketeering activiies" within 18 U.S.C. § 1961(1) in violation of 18 U.S.C. § 1962(b) by 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (interstate wire fraud).

398.    Freddie, Quiñones-Coll and Sofia's violations of 33 L.P.R.A. § 3022 (criminal fraud),  33 L.P.R.A. § 5534 (conspiracy to defraud), 33 L.P.R.A. § 4838 (2004) (fraud), 31 L.P.R.A. § 3408 (2004) (deceit), 33 L.P.R.A. § 4872-78 (2004) (conspiracy), 32 L.P.R.A. § 3352t, and 14 L.P.R.A. §§ 3563-64 (breach of fiduciary duty),  show an intent to cheat and defraud and manifests by their duration, their similarity, and their persistence, a regular way of doing business by Freddie, Quiñones-Coll and Sofia of the Titín Enterprise by virtue of being officers, directors and executive director to the present day, but not for the purpose of

establishing liability and damages under Puerto Rican law. The "cheating" here violated basic standards of moral uprightness, fundamental honesty, fair play, and right dealing in the general and business life of the members of society. Plaintiffs plead the comprehensive scope of the injury to business and property of the Plaintiffs by the RICO Defendants, FSIC and the Titín Foundation for the benefit of the Court, but they seek only to recover for the injury to their "business and property" within 18 U.S.C.§ 1964(c).

399.    Freddie, Quiñones-Coll and Sofia acted knowing that these "racketeering activities" within 18 U.S.C. §§ 1961(1), 1962(b), 1964(c) would proximately and directly cause FSB, Doña Mildred, and others, to suffer these damages to their "business and property" within 18 U.S.C. § 1964(c). All of FSB's and Doña Mildred's damages were reasonably foreseeable by the RICO Defendants and FSIC and were anticipated as a substantial factor and a natural consequence of their pattern of "racketeering activity" within 18 U.S.C. § 1961(1).

400.    By reason of these violations, FSB and Doña Mildred have suffered (and are suffering) substantial injury to their "business and property" within 18 U.S.C. § 1964(c).

### NINTH CAUSE OF ACTION

**[AGAINST ALL RICO DEFENDANTS, TITÍN FOUNDATION, AND FSIC
FOR VIOLATIONS OF 18 U.S.C. § 1962(d)
FOR CONSPIRING TO VIOLATE 18 U.S.C. § 1962(b)]**

401.    The allegations contained in paragraphs 1 through 305 of this Complaint are realleged and incorporated.

402.    18 U.S.C. § 1962(d) provides:

> It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

403.    FSB and Doña Mildred is each a "person" under 18 U.S.C. §§ 1961(3) and 1964(c), "an entity capable of holding a legal or beneficial interest in property," and was injured

by reason of the "racketeering activity" within 18 U.S.C.§ 1961(1) of the RICO Defendants, Titín Foundation, and FSIC.

404.   Each of the RICO Defendants, the Titín Foundation, and FSIC is a "person" under 18 U.S.C. §§ 1961(3)  1962(b), 1964(c).

405.   The Titín Foundation is a corporation organized and existing under the laws for Puerto Rico and is an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) 1962(b) and 1962(d) ("Titín Foundation Enterprise"), and "an entity capable of holding a legal or beneficial interest in property." The Titín Foundation Enterprise is, and was, engaged in, and the activities of which affected, interstate commerce.  Each of the RICO Defendants, the Titín Foundation, and FSIC conspired within 18 U.S.C. § 1962(d) to violate 18 U.S.C. § 1962(b) to acquire or maintain control of, directly or indirectly, the Titín Foundation Enterprise, by a "pattern of racketeering activity" within 18 U.S.C. § 1961(1), through multiple, repeated, and continuous violations of 18 U.S.C. § 1962(b) by 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (interstate wire fraud).

406.   The RICO Defendants' the Titín Foundation's, and FSIC's "pattern of racketeering activity" within 18 U.S.C. § 1961(5) consisted of the commission of numerous "racketeering activities" within 18 U.S.C.§ 1961(1) in violations of 18 U.S.C. §§ 1962(b), 1962 (d) by 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (interstate wire fraud).

407.   The RICO Defendants' the Titín Foundation's, and FSIC's violations of 33 L.P.R.A. § 3022 (criminal fraud),  33 L.P.R.A. § 5534 (conspiracy to defraud), 33 L.P.R.A. § 4838 (2004) (fraud), 31 L.P.R.A. § 3408 (2004) (deceit), 33 L.P.R.A. § 4872-78 (2004) (conspiracy), 32 L.P.R.A. § 3352t, and 14 L.P.R.A. §§ 3563-64 (breach of fiduciary duty) show an intent to cheat and defraud and manifest by their duration, their complexity, and their persistence, a regular way of doing business by the RICO Defendants, the Titín Foundation, and

FSIC of the affairs of the Titín Foundation to the present day, but not for the purpose of establishing liability and damages under Puerto Rican law. The "cheating" here violated basic standards of moral uprightness, fundamental honesty, fair play, and right dealing in the general and business life of the members of society. Plaintiffs plead the comprehensive scope of the injury to business and property of the Plaintiffs by the RICO Defendants, FSIC and the Titín Foundation for the benefit of the Court, but they seek only to recover for the injury to their "business and property" within 18 U.S.C.§ 1964(c).

408.    The RICO Defendants, the Titín Foundation, and FSIC acted knowing that these "racketeering activities" within 18 U.S.C. §§ 1961(1), 1962(b), 1962(d), 1964(c) would proximately and directly cause FSB, Doña Mildred, and others, to suffer these damages to their "business and property" within 18 U.S.C. § 1964(c). All of FSB's and Doña Mildred's damages were reasonably foreseeable by the RICO Defendants, the Titín Foundation, and FSIC and were anticipated as a substantial factor and a natural consequence of their pattern of "racketeering activity" within 18 U.S.C. § 1961(1).

409.    By reason of these violations, FSB and Doña Mildred have suffered (and are suffering) substantial injury to their "business and property" within 18 U.S.C. § 1964(c).

**C.    Joint Prayer For Damages Common To RICO Causes Of Action (Counts First Through Ninth).**

410.    As a direct and proximate result of these unlawful and intentional schemes to defraud and cheat by the Defendants, Plaintiffs sustained (and will continue to sustain) actual, consequential, incidental and statutory damages to their business and property of approximately $100 Million.

411.    18 U.S.C. § 1964(c) provides for the recovery of treble damages.  Plaintiffs are also entitled to recover their attorneys' fees, litigation expenses, and court costs under 18 U.S.C.

§ 1964(c), and Puerto Rico law.

412.   All conditions precedent to Plaintiffs' claims for attorneys' fees, litigation expenses, and court costs have been performed and occurred.

413.   Plaintiffs are entitled to equitable relief, as may be appropriate, under 18 U.S.C. § 1964(a), or other law, including disgorgement of illicit gains, a constructive trust, an equitable accounting for all illicit benefits, considerations, and revenues, gross profits, fees and earnings received, directly or indirectly, by the Defendants in any way, directly or indirectly, derived from their unlawful conduct in violation of 18 U.S.C. § 1961, *et seq.*

WHEREFORE, Plaintiffs demand judgment, jointly and severely, against the Defendants, in an amount in excess of $100 million, trebled to an amount in excess of $300 million, pre-judgment interest, for their attorneys' fees and costs, the imposition of a constructive trust, the voiding of unlawful transfers, the disgorgement of all ill-gotten revenues, gross profits and earnings and any and all amounts by which the Defendants have been unjustly enriched and such other relief as the Court deems proper.

**D.      The Two Causes of Action Under Puerto Rico Law.**

**TENTH CAUSE OF ACTION**

**[AGAINST DEFENDANT FREDDIE MARTÍNEZ-ÁLVAREZ, QUIÑONES-COLL;
SOFIA MARTINEZ-ALVAREZ AND
FREDDIE'S LAW FIRM FOR BREACH OF FIDUCIARY DUTY]**

414.   The allegations contained in paragraphs 1 through 287 of this Complaint are realleged and incorporated.

415.   Officers and directors of Puerto Rican corporations owe fiduciary duties to those corporations including incorporated non-profits and foundations. 14 L.P.R.A. §§ 2724,  3563-64. Officers and directors must fully disclose any conflicts of interests, in particular personal financial interests, in any transaction, vote or activity to the corporation and to all disinterested

members of the board or committee. 14 L.P.R.A.§§ 2724, 3563-64.  The conduct of officers and directors are held to the highest standards of good faith, loyalty and care.  Officers and directors of non-profits must use their "best" judgment.

416.    In representing the interests of their clients, attorneys are also bound by a fiduciary duty to them pursuant to 32 L.P.R.A § 3352t  as well as Canons 19, 21, 23 and 38 of the Puerto Rico Canons of Legal Ethics.  The attorney-client relationship is founded on absolute honesty and complete loyalty.

417.    The standard for fiduciary duty is set forth in 32 L.P.R.A. § 3352t (duties of the fiduciary).

418.    FSB and Doña Mildred engaged and relied upon Freddie, Quiñones-Coll, and Freddie's Law Firm as fiduciaries and attorneys for Plaintiffs, to protect their best interests in all matters, financial or otherwise, *i.e.*, to act in a fiduciary relationship with respect to their business and financial interests.  Therefore, Freddie, Quiñones-Coll, and Freddie's Law Firm were prohibited from undertaking, and should have avoided, a simultaneous representation of clients with adverse interests as well as any subsequent representation that would adversely affect a former client's interests.  Nor should they have undertaken any representation where their independent judgment on behalf of any client may be affected by their personal interests.  An attorney must avoid actions that give room for the slightest suspicions that they are acting for interests, personal or of another client, that conflict with the interests of any other client.

419.    Freddie, Quiñones-Coll, Sofia, and Freddie's Law Firm grievously breached their respective fiduciary duties, both as lawyers and as officers, directors, executive directors, to Plaintiff  FSB and to Doña Mildred.

420.    Freddie, Quiñones-Coll, Sofia, and Freddie's Law Firm breached their collective

and individual duties owed to FSB and Doña Mildred by having acted in their own self-interest, engaged in self-dealing, seized corporate opportunities, paid themselves and related corporations for faithless services, made *quid pro quo* donations to increase the business of Freddie's Law firm or of Martinal, engaged in undue influences on elderly individuals, manipulating and cheating an aging Doña Mildred, diverted FSIC and FSB funds into their personal control, concealed from Plaintiffs both the existence and the status of her/his/their conflicting attorney-client, executor-testator, corporation-director, foundation-officer, foundation-trustee, and other relationships between her/him/them and Titín, Martinal, FSIC, the Titín Foundation and the consequences those conflicts and representations had or might have on her/his/their votes, actions, recommendations,  representation of, and advice to, Plaintiffs.

421.   Freddie, Quiñones-Coll, Sofia, and Freddie's Law Firm breached her/his/their fiduciary duties to Plaintiffs in failing to disclose to Plaintiffs and, in fact, concealing from them, both the existence and the status of Freddie's, Quiñones-Coll's, Sofia's, and Freddie's Law Firm's attorney client, executor-testator, corporation-director, corporation-officer, foundation-executive director, foundation-trustee, and other relationships between them and Titín, Martinal, FSIC, and the Titín Foundation, their gross conflicts of interests, including self-interests, and the consequences they had on the execution of their fiduciary duties as officers, directors, trustees, for, legal representation of and advice to Plaintiffs.

422.   Plaintiffs have been damaged in an amount to be determined at trial but is presently estimated to be $100 million.

WHEREFORE, Plaintiffs  respectfully demand judgment, jointly and severally, against Defendants Freddie, Quiñones-Coll, Sofia, and Freddie's Law Firm for their violations of 32 L.P.R.A. § 3352t and 14 L.P.R.A.§§ 2724,  3563-64 in an amount not less than $100 million,

pre-judgment interest, attorney fees and costs.

## ELEVENTH CAUSE OF ACTION

### [AGAINST ALL DEFENDANTS FOR DECEIT AND CONSPIRACY]

423.   The allegations contained in paragraphs 1 through 287, 414-22 of this Complaint are realleged and incorporated.

424.   In inducing FSB and Doña Mildred, into permitting Freddie as a trusted personal and family advisor, Freddie and Quiñones-Coll to hold positions on the FSB and FSIC Board and members of FSB, as officers, and Sofia to serve as an executive director of FSB, for Alfie and Martinal to enter into the Martinal administration contract and manage FSB's and FSIC's assets, for Freddie, Quiñones-Coll, and Freddie's Law Firm to serve as counsel to FSB and Doña Mildred without making the disclosures of any or all of their self-interests, of their conflicts of interests, personally and among their clients, as agents of Martinal and the Titín Foundation, of the material facts alleged, Freddie, Quiñones-Coll, Sofia, Alfie, Martinal, the Titín Foundation and Freddie's Law Firm engaged in fraud and deceit.

425.   Freddie, Quiñones-Coll, and Freddie's Law Firm impliedly represented to FSB and the FSB Board, and to Doña Mildred – as every lawyer impliedly represents to every client – that Freddie, Quiñones-Coll, and Freddie's Law Firm would, among other things:

      a.     maintain the confidentiality of the matters discussed between Freddie, Quiñones-Coll and Freddie's Law Firm, as attorneys, and FSB and/or Doña Mildred, as clients, in the strictest confidence and without disclosing any confidential matter to any person not authorized to receive it;

      b.     faithfully represent FSB and Doña Mildred without either Freddie, Quiñones-Coll or Freddie's Law Firm having or entering into any conflict with either of them, and conduct themselves with the strictest loyalty towards the protection of the interests of those clients;

c.      promptly disclose any conflict of interest or adverse interest that either Freddie, Quiñones-Coll or Freddie 's Law Firm had, considered having, or obtained with the interests of FSB and/or Doña Mildred.

426.    Freddie's, Quiñones-Coll's, and Freddie's Law Firm's representations that they would do the things set forth in the preceding paragraphs of this Complaint, whether express or implied, were material representations.

427.    Freddie, Quiñones-Coll, and Freddie's Law Firm engaged in words and insidious machinations as set forth above, that induced Plaintiffs to engage and to believe they had engaged the honest legal services of Freddie, Quiñones-Coll, and Freddie's Law Firm.

428.    Without the words and insidious machinations set forth above, neither FSB nor Doña Mildred would ever have engaged Freddie, Quiñones-Coll, or Freddie's Law Firm to perform any legal services for either of them.

429.    Freddie, Quiñones-Coll, and Freddie's Law Firm did not do, and did not intend to do, the things that they represented above that they would do as counsel to FSB and Doña Mildred if retained and compensated as counsel for either or both of them.

430.    Freddie, Quiñones-Coll, and Freddie's Law Firm did not and have not maintained the confidentiality of the materials and proprietary information provided to them by FSB and Doña Mildred in representing either both or one of them.

431.    Freddie's, Quiñones-Coll's, and Freddie's Law Firm's representations that they would do the things set forth extensively above were false.

432.    In doing the things alleged in this Complaint, in particular, in inducing FSB and Doña Mildred, by *dolo*, in violation of 31 L.P.R.A. § 3408 (2004) (deceit), 31 L.P.R.A. § 3432 (2004) (contracts with no, or illicit, consideration), and  31 L.P.R.A. § 3021 (2004) (fault or negligence), into treating Freddie and a trusted personal and family advisor, placing Freddie and

Quiñones-Coll on the FSB Board, and electing them, and Sofia, as officers, and executive director of FSB in entering into the Martinal administrative contract and in engaging Freddie, Quiñones-Coll, and Freddie's Law Firm as attorneys for FSB, the FSB Board, and Doña Mildred, Freddie, Quiñones-Coll, Sofia, Alfie, Martinal, the Titín Foundation, and Freddie's Law Firm have damaged and continue to damage FSB and Doña Mildred.

433.    The actions and omissions of Freddie, Quiñones-Coll, Alfie, Martinal, the Titín Foundation, Sofia and Freddie's Law Firm constitute serious deceit.

434.    The actions and omissions of Freddie, Quiñones-Coll, Alfie, Martinal, the Titín Foundation, Sofia and Freddie's Law Firm constitute both incidental deceit and serious deceit.

435.    As a result of the serious deceit of Freddie, Quiñones-Coll and Freddie's Law Firm in their representation of FSB and Doña Mildred, FSB and Doña Mildred were not consenting parties with adequate knowledge of the consequences of their actions, and were thus deprived of the expression of their free will.

436.    Freddie, Quiñones-Coll, and Freddie's Law Firm caused and continue to cause losses and damages to Plaintiffs as a result of the serious deceit of Freddie, Quiñones-Coll, and Freddie's Law Firm in their representation of Plaintiffs, and their failures in the performance of their obligations as attorneys to Plaintiffs.

437.    Freddie, Quiñones-Coll, Sofia, and Freddie's Law Firm acted with intent and in a malicious and reprehensible manner, in willful disregard of the rights of Plaintiffs, which have caused and continue to cause losses and damages to Plaintiffs.

438.    In doing these things in this Complaint, in particular, in misrepresenting the nature and quality of their loyalty to Plaintiffs as directors and officers, attorneys and of their representation of Plaintiffs in concealing the existence and the status of the numerous acts of

self-dealing, manipulation and cheating, theft of corporate opportunities, lies, deceits, false statements and omissions (by persons under a duty to speak with candor), to all schemes to defraud, cheating, coercion, conflicts of interest discussed above, and in actively concealing their activities for and representation of conflicting interests of Titín, Martinal, FSIC, the Titín Foundation to those of Plaintiffs, Freddie, Quiñones-Coll, Sofia and Freddie's Law Firm all gave substantial assistance in a plan to use undue influence to divert, and to defraud Plaintiffs out of, their natural and reasonably expected entitlement to the Segarra-Boerman Family wealth, with knowledge that their actions were contributing to the defrauding of Plaintiffs into permitting Freddie and Quiñones-Coll to serve as members of the FSB Board, and, with Sofia, as officers, or executive directors and in representing Plaintiffs as their attorneys, while at the same time they were acting in the best interests of themselves personally, Titín, Martinal, FSIC, Titín Foundation to the detriment of the interests of Plaintiffs.

439.    In doing the things alleged in this Complaint, Freddie, Freddie's Law Firm, Quiñones-Coll, Alfie, Sofía, Martinal, FSIC, and the Titín Foundation all knew of Freddie's plan to defraud Plaintiffs of their fair shares of the Segarra-Boerman Family wealth, and all of them took affirmative steps to encourage the achievement of that goal including engaging in undue influence, the preparation of Titín's wills to their sole advantage, abusing the trust reposed in them, the preparation of manipulative and cheating letters, closing documents and other legal documents, giving self-interested and deceiving personal advice, involving self-interested advisors related to the buyout of Doña Mildred's interest in FSIC, as described above, all in violation of 33 L.P.R.A. § 3022 (criminal fraud), 33 L.P.R.A. § 5534 (conspiracy to defraud), 33 L.P.R.A. § 4838 (2004) (fraud), 31 L.P.R.A. § 3408 (2004) (deceit), 33 L.P.R.A. § 4872-78 (2004) (conspiracy), 32 L.P.R.A. § 3352t and 14 L.P.R.A. § 3563-64 (breach of fiduciary duty).

440.    Freddie, Freddie's Law Firm, Quiñones-Coll, Alfie, Martinal, Sofía, FSIC, and Titín Foundation each knew that the conduct of each of them gave substantial assistance or encouragement to the other to engage in the fraudulent conduct perpetrated upon Plaintiffs, and that FSB's and Doña Mildred's lack of knowledge about the relationship between and among Freddie, Freddie's Law Firm, Quiñones-Coll, Alfie, Sofía, Martinal, FSIC, and the Titín Foundation, and Plaintiffs' reliance on the perceived integrity and ability of Freddie, Quiñones-Coll, Sofia, Alfie, Freddie's Law Firm, Martinal, and others would induce Plaintiffs into taking whatever actions and into executing whatever documents were recommended by them, in particular Freddie, without demanding further evidence of the truth of the representations which induced them into acting or the relative benefits to them of following their/his advice.

441.    Freddie, Quiñones-Coll, Sofia, Alfie, Freddie's Law Firm, Martinal, FSIC, the Titín Foundation all agreed and conspired to defraud and deceive Plaintiffs.  Their conspiracy and conspiratorial actions in furtherance of their conspiracy has damaged Plaintiffs in an amount to be determined at trial but is currently estimated to be $100 million.

WHEREFORE, Plaintiffs request judgment, jointly and severally, against Freddie, Quiñones-Coll, Sofia, Alfie, Martinal, FSIC, the Titín Foundation and Freddie's Law Firm in an amount not less than $100 million, prejudgment interest, their attorney fees and costs.

### E.    <u>Request For Equitable Relief.</u>

442.    The allegations contained in paragraphs 1 through 441 of this Complaint are realleged and incorporated.

443.    Titín's death resulted in the overwhelming majority of the Segarra-Boerman Family wealth – estimated to be $100 million – devolving to FSIC and the Titín Foundation, and thereby falling under the complete dominion and control of Freddie and his confederates, in violation of RICO and the laws of Puerto Rico.

444.    The declared value of the estate left by Titín to the Titín Foundation as prepared by Freddie exceeded $56.5 million, according to the estate's *Hacienda* filing ("*Detalle de Otros Bienes*").

445.    FSIC – of which Titín owned One Hundred Percent (100%) at the time of his death as a result of this FSIC Buyout – is the owner of many millions of dollars in real estate assets, the true value of which was not declared by Titín's estate in the *Hacienda* filing.

446.    The Titín Foundation remains an organization that was purportedly created for charitable purposes, but which is being used for much more primarily for Freddie's benefit and to enhance his image and notoriety.

447.    It was not and is not Freddie's intention to conduct the affairs of the Titín Foundation for legitimate charitable purposes, but only those that will benefit him, his family, and enhance his image and notoriety.

448.    It is Freddie's intention to utilize FSIC and the Titín Foundation to enrich himself and his family and associates by employing Freddie's Law Firm and its members; Martinal, his own children, Alfie and Sofía; his cousins, including his law partner Quiñones-Coll; his brother-in-law, González Pumarada; and anyone else upon whom he chooses to bestow his financial largesse by disbursing the Segarra-Boerman Family wealth – all at substantial salaries and with considerable expense and fee reimbursement, until the entire Segarra-Boerman Family wealth, including those portions held by FSIC, Titín, and the Titín Foundation (but, thankfully, excluding the assets of Doña Mildred and FSB) have been diverted to Freddie's personal use.

449.    Plaintiffs come with clean hands, FSB having been created by Don Felipe in 1973 and its Segarra-Boerman Family members having participated in good faith, and having complied with the terms and conditions of its creation, and Doña Mildred being Don Felipe's

only daughter, only surviving child, and a woman of unimpeachable integrity.

450.     The assets held by the Titín Foundation and FSIC are assets held in constructive trust stolen by faithless fiduciaries from Plaintiffs.

451.     If Freddie is permitted to retain control over FSIC and the Titín Foundation, either directly or indirectly, a substantial probability exists that he will divert the assets from the Foundation to his personal use and remove them from this jurisdiction.

452.     If Freddie, Quiñones-Coll, Sofia, Alfie, Martinal, the Titín Foundation, FSIC and Freddie's Law Firm succeed in concealing the assets of FSIC and the Titín Foundation and the proceeds from the illegal operation of FSIC and the Titín Foundation that have been or will be received by them, directly or indirectly, including through Martinal, or from any of the other defendants in this case, or any third party, remove said assets from this jurisdiction, Plaintiffs will be deprived of their assets formerly held in trust by Defendants, and corporate and business opportunities that those trust assets would provide for its charitable purposes, thereby injuring Plaintiffs and the people of Puerto Rico, and causing Plaintiffs, and others irreparable harm for which Plaintiffs have no adequate remedy at law to recover assets stolen by fiduciaries.

453.     In balancing the equities of the award of injunctive relief in favor of Plaintiffs against any harm that might be suffered by Freddie, FSIC, Quiñones-Coll, Sofia, Alfie, the Titín Foundation, Martinal or Freddie's Law Firm if they are enjoined from receiving, directly or indirectly, and required to return all past and any further payments from the assets of FSIC and the Titín Foundation, the balance of equity favors the grant of injunctive relief to protect Plaintiffs' rights, because Defendants, in particular Freddie, will be stopped from converting the assets of FSIC and the Titín Foundation, while Plaintiffs will be deprived of the ability to recover their assets held or controlled in trust by faithless fiduciaries by Freddie and certain of the other

Defendants, in particular, by Freddie, and it will enable Freddie to continue to perpetrate and take the benefit from his egregious breaches of his fiduciary duties, his bad faith, his undisclosed conflicts of interest and his other actionable conduct, including the pillaging of the Segarra-Boerman Family wealth.

454.     Puerto Rico public policy heavily favors parties' compliance with the terms of their contracts and the discharge of their contractual obligations in good faith, with the duties imposed to be discharged in the manner of a "good father of a family," and abhors fraudulent and coercive conduct of contracting parties; thus, Puerto Rico public policy favors the grant of the injunctive relief sought by Plaintiffs.

WHEREFORE,  in view of the allegations of this Complaint, FSB and Doña Mildred request a preliminary and permanent injunction that:

A.     ENJOINS Defendants, and any other person, firm or organization working in concert, directly or indirectly, with any of them from in any way altering the status quo with respect to the assets of FSIC, and the Titín Foundation;

B.     ENJOINS Defendants, and any other person, firm or organization working in concert, directly or indirectly, with any of them from in any way selling any of the assets of FSIC, and the Titín Foundation;

C.     ENJOINS Defendants, and any other person, firm or organization working in concert, directly or indirectly, with any of them from in any way receiving any payments from FSIC, and the Titín Foundation; and

D.     ORDERS Defendants, and any other person, firm or organization working in concert, directly or indirectly, with any of them from, to make a complete accounting of all

monies and other assets of FSIC and the Titín Foundation that any of them or their employers has received and expended on behalf of FSIC, Titín and the Titín Foundation.

E.      ORDERS the imposition of constructive trusts and equitable liens on all properties held or obtained by the defendants' scheme to defraud and cheat as alleged in this Complaint.

F.      ORDERS the disgorgement to Plaintiffs, based on the scheme to defraud and cheat by fiduciaries of all funds and other property unlawfully obtained or in the possession of all of the Defendants and those, directly or indirectly, in their control.

G.      Any other Order that the Courts find to be in the interest of justice.

## PLAINTIFFS' DEMAND FOR JURY TRIAL

Plaintiffs demand trial by a jury on all of the causes of action in this Complaint that are triable by a jury.

Dated:  November 2, 2016.

STROOCK & STROOCK & LAVAN LLP
200 S. Biscayne Boulevard, Suite 3100
Miami, Florida  33131
Telephone:  (305) 978-9300
Facsimile:  (305) 978-9302

WEINSTEIN-BACAL, MILLER & VEGA, P.S.C.
González-Padín Building - Penthouse
154 Rafael Cordero Street, Plaza de Armas
Old San Juan, Puerto Rico 00901
Telephone: (787) 977-2550
Facsimile:  (787) 977-2559

*Attorneys for Plaintiffs*

By:   s/Lewis F. Murphy*
          Pro Hac Vice
By:   s/ James G. Sammataro*
          Pro Hac Vice
By:   s/ Hans H. Hertell
          U.S.D.C. No. 228307

*Attorneys for Plaintiffs*

By:   s/Stuart A. Weinstein-Bacal
          U.S.D.C. No. 204208

By:   s/Peter W. Miller
          U.S.D.C. No. 213609


S/G. Robert Blakey*
G. Robert Blakey
Pro Hac Vice
WILLIAM J. & DOROTHY T. O'NEIL
Professor of Law Emeritus*
Notre Dame Law School
7002 East San Miguel Ave.
Paradise Valley, AZ 85352 5970
Telephone:  (574) 514 8220
Email:  blakey.1@nd.edu

S/Michael Volkov*
Michael Volkov
Pro Hac Vice
THE VOLKOV LAW GROUP
1101 Connecticut Avenue, N.W., Suite 600
Washington, D.C. 20036
Telephone: (202) 659-6927
Email: mvolkov@volkovlaw.com


*Pro Hac Motions To Be Filed